**Opinion issued December 13, 2018**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-16-00631-CV

_____

**PRIMORIS ENERGY SERVICES CORPORATION D/B/A SPRINT PIPELINE SERVICES, Appellant**

**V.**

**THOMAS MYERS, Appellee**

---

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-46862**

---

## O P I N I O N   O N   R E H E A R I N G

Appellee, Thomas Myers, filed a motion for rehearing of our August 30, 2018 opinion and judgment. The parties subsequently notified the Court that they have settled this matter and that "[n]either party will pursue any further relief in this Court or in any other court." Accordingly, we dismiss the motion for

rehearing, pursuant to the parties' settlement, but withdraw our opinion and judgment of August 30, 2018, and issue the following opinion and new judgment in their stead.

Appellant, Primoris Energy Services Corporation, doing business as Sprint Pipeline Services ("Sprint"), challenges the trial court's judgment, entered after a jury trial, in favor of Myers in his suit for negligence. In five issues, Sprint contends that the trial court erred in admitting evidence of medical expenses, the evidence is factually insufficient to support the jury's proportionate responsibility findings, and the evidence is legally and factually insufficient to support the jury's negligence finding against Sprint and the damages it awarded to Myers of $2 million for future physical impairment and $500,000 for future pain.

We affirm, in part, and reverse and remand, in part.

## Background

In his second amended petition, Myers alleged that Sprint, a pipeline company, secured an easement across his ranch to transport vehicles and equipment to an adjacent property, on which it was constructing a pipeline. Sprint hired Montgomery Trucking Company ("Montgomery") to transport equipment for the project. And Montgomery hired Justin Thomas Baggett, despite knowing that he had "numerous unsafe[] traffic violations," to drive its truck for Sprint.

2

On January 26, 2014, Baggett attempted to maneuver an 18-wheeler truck and trailer ("18 wheeler") loaded with Sprint's materials through the gate, which was "entirely too narrow to accommodate the size of the truck," to Myers's ranch. Sprint had two "flagmen employees" assisting Baggett through the driveway. However, as Baggett reversed the 18-wheeler, he collided into the four-wheeler vehicle ("four-wheeler") on which Myers was sitting. As a result, Myers "suffered a severe four-level cervical disc herniation that impinged on his spinal cord, requiring a four-level fusion surgery of the cervical spine." He also "suffers from severe radiculopathy, neck pain, back pain and related atrophy of the right arm."

Myers sued Sprint, Montgomery, and Baggett (the "defendants") for negligence. Specifically, in regard to Sprint, Myers alleged that it, "by and through its agents, representatives, and/or employee spotters," failed to "properly train its spotters, agents, representatives and/or employees"; "properly equip its spotters with communication equipment to properly and clearly communicate with" Baggett; "properly communicate with the truck driver and . . . warn the truck driver concerning [Myers] and his four-wheeler"; "warn [Myers] that the truck was intending on backing up to the area where [he] was sitting on his four-wheeler"; and "timely build an alternative and safe ingress and egress (driveway) for [Myers's] property after having knowledge of the troublesome and dangerous

condition of the existing range gate for the 18-wheelers entering and exiting the property which would have completely avoided this incident."

Myers further alleged that the defendants' negligence proximately caused damages for past and future pain and suffering, mental anguish, medical expenses, disfigurement, and physical impairment, as well as past and future economic damages arising from "costs associated with running his ranch since he is physically unable to do the work required to run a ranch of [its] size as he ha[d] done in the past before his injury."

Sprint filed an answer, generally denying the allegations and asserting that the collision was instead caused by the negligence of Myers or others.

At trial, Myers testified that in 2013, he granted BridgeTex Pipeline LLC ("BridgeTex") an easement to construct and operate a pipeline along his sixty-six-acre ranch in Montgomery, Texas. Sprint was the contractor in charge of constructing the pipeline, and its only point of access to the easement was through Myers's gravel driveway, which had a narrow gate. Although Myers granted BridgeTex and Sprint access to the driveway, he expressed concern about large trucks using the gate due to its narrowness, the angle of the approach, and the elevation drop. He suggested that they build a separate construction entrance that would better accommodate the vehicles and other equipment, but Sprint and BridgeTex declined to do so. After a truck, on January 8, 2014, hit Myers's gate,

4

pulling the frame over and uprooting the concrete foundation, Sprint agreed to build a separate construction driveway. And, in the meantime, it put "spotters" on location to guide trucks through the gate.

On January 26, 2014, Myers drove his four-wheeler to the gate to check on the progress of the construction of the new driveway. While watching a crew working on the fence, he heard some "yelling" coming from the gate area. Myers drove his four-wheeler over to determine what had happened, and he saw that another 18-wheeler had struck the gate. He stopped his four-wheeler and picked up his cellular telephone to call the land agent to inform him of what had happened. Myers explained that, at this time, the 18-wheeler was stationary. Because its break lights were on and a spotter was nearby, Myers did not believe that there was any indication that the 18-wheeler would move while he was on his cellular telephone.

While standing on his four-wheeler, Myers turned his back to the 18-wheeler and began to leave a message for the land agent. At that moment, the trailer of the truck struck his four-wheeler. His head snapped back, and he saw a "flash of white." Myers then saw the trailer of the truck continue to move towards him, but it came to a stop before running him over. He got off of his four-wheeler and examined his body, not immediately noticing any apparent injuries. Eventually Myers went inside his home to lay down.

As his adrenaline wore off, Myers noticed paralysis around his neck and spine. He also began to experience intense pain. Initially, Myers tried to "sleep it off," but decided to see a doctor several days later when the pain did not subside. After some testing, a doctor diagnosed Myers as suffering from six herniated discs and a compressed spinal cord. To treat these injuries, Myers, in August 2014, had a four-level disc-fusion surgery, in which four of his six herniated discs were removed, his spinal cord was "un-pinched, and his vertebrae were fused back together. Myers explained that the surgery has helped him, but his overall strength and mobility is still impaired. For example, he cannot lift more than ten pounds of weight with his right arm, and the muscles in it have greatly atrophied.

Myers described himself, after having sustained his injuries, as "feeble." And he explained that he can no longer run the equipment on his ranch, continue employment as a body guard, or "ride [his] daughter on his shoulders" as he was able to do before the collision. Consequently, his property is deteriorating because he cannot maintain it as he did previously. Before the collision, he maintained the ranch by clearing and mowing the lawns and pastures, repairing fences, and servicing the vehicles and other heavy equipment. After the collision, although Myers is able to use a riding lawn mower, he cannot operate the heavy equipment needed to cut, rake, bale, haul, and stack hay. And he cannot perform most of the other regular work around the ranch. However, Myers is still able to drive a

6

vehicle and operate a gun range on his property. And he does not need any nursing or other personal care.

Dr. Nilesh Kotecha, a board-certified neurosurgeon, testified that he performed Myers's four-level fusion surgery. After physically examining Myers and reviewing his MRI, Kotecha diagnosed him as suffering from "multilevel cervical disc herniations and . . . [a] spinal cord compression." He also noted that Myers's MRI revealed some pre-existing, chronic degeneration in his neck. But Kotecha ultimately determined that the severe, acute injuries were caused by the collision.

In August 2014, Dr. Kotecha performed a four-level fusion surgery on Myers's cervical spine, which involved removing four of his herniated discs, un-pinching his spinal cord, and then fusing his vertebrae back together with spacers and bone taken from his sternum. He explained that he left two of Myers's herniated discs untreated because a five-level fusion is considerably more extensive and those discs were not compressing Myers's spinal cord. He further explained that although the surgery was successful, Myers will experience limitation in his range of motion, will not be able to bend and twist his neck "as much as he would otherwise," and should not lift more than 20 to 30 pounds. And while Myers's muscle atrophy could improve with therapy, any atrophy resulting from permanent nerve damage will not improve.

7

Dr. Kotecha further testified that Myers, at his follow-up visit in February 2015, did not require any prescription pain medicine. Moreover, his surgical wound had healed nicely, and he had "good" range of motion of his cervical spine. In regard to Myers's medical expenses, Kotecha explained that the surgery he performed on Myers was medically necessary and the bills from the surgery were "reasonable and customary."

James Evans, an accident reconstructionist, testified that he took statements from the witnesses to the collision, gathered data from the scene, and inspected the vehicles to determine the facts surrounding the collision in this case. He has reconstructed many collisions involving tractor-trailers, such as the 18-wheeler in the collision in the instant case, and has significant experience with all-terrain vehicles like the one Myers was on at the time of the collision. Evans explained that there is ample evidence available to reconstruct the collision in this case, including: a photograph that Myers took of the 18-wheeler after it hit his gate, photographs from after the collision that show tire marks and damage to the vehicles, and information regarding the dimensions of and damage to the vehicles.

Evans input the data that he had collected into a computer-aided drafting program to draw the scene to scale and reconstruct the collision. He opined that Baggett reversed without first exiting the 18-wheeler to check his surroundings and that Sprint's spotters did not do their job to warn Baggett of any hazards

8

obstructing his path. Evans further opined that Myers was in "small part" to blame for the collision. However, he attributed primary fault to Baggett and Sprint's spotters. Specifically, Evans explained that spotters are placed on site to assist a driver when he does not have full visibility and to warn others in the area to avoid collisions.

Darrell Hurst, a ranch-hand expert who manages a 250-acre ranch in Navasota, Texas, testified that Myers's fences, pastures, creek, equipment, cattle, and pecan trees require daily maintenance. Thus, Myers would need to hire someone who knows how to build and maintain fences, care for cattle, perform mechanical work and carpentry, and maintain river banks, barns, and trees. This type of work requires heavy lifting and operation of heavy machinery, in excess of 30 pounds. In Hurst's opinion, to maintain his ranch, Myers would need to hire someone to work on it six days per week for eight hours per day. He further opined that a reasonable hourly rate for this type of labor is $20 per hour. Hurst explained that when he toured Myers's ranch, it was in a state of "disarray." The pastures and fences had not been maintained, and the creek bed had overflowed and damaged a portion of the barbed-wire fencing that contains Myers's cattle. However, Hurst acknowledged that he was not aware of the condition of Myers's ranch prior to the collision.

Baggett testified that he was employed by Montgomery and drove the 18-wheeler that hit Myers on January 26, 2014. He explained that there were two spotters from Sprint assisting him that day: one spotter was stationed outside of Baggett's window and a second one, whom Baggett could not see, was stationed behind the trailer of the 18-wheeler. The spotter stationed outside of his window told Baggett that "he could see everything back there." That same spotter is the person who told him to stop the 18-wheeler because he had "rubbed the gate." After he was told that he had hit the gate, Baggett kept his foot on the brake without moving the 18-wheeler for one to two minutes. He drove off only after the spotter told him that he was "clear." Baggett further explained that the 18-wheeler did not make any "beeping" sound or other noise when it reversed. He had to rely on the spotters, who were not using flags or noisemakers, to guide him. And no one informed him that the trailer had hit Myers until he received a telephone call approximately 30 minutes later.

Diana M. Dooley testified by deposition that, in 2014, she was the Director of the Business Office for Spring Central Hospital, where Myers had his surgery. She is familiar with the billing practices of that facility and also has an extensive background in hospital billing. Dooley explained that, for his four-level fusion surgery, Myers was charged $201,570.54. She then opined that those charges were reasonable for the type of surgery performed on him.

10

James S. Bryan, a safety professional for Sprint at the time of the collision, testified by deposition that Sprint does not require their spotters to undergo any special training because it is a "common sense task." And he noted that Myers declined medical attention immediately following the collision.

Cecil Wyatt, a pipeline inspector who was working on Myers's property at the time of the collision, testified by deposition that on the day of the collision, he heard a "commotion" and went over to the gate. When he arrived, he saw Myers sitting on his four-wheeler with the bumper of the truck "up against" it.

Dr. Jerry Bob Blacklock, a board-certified neurosurgeon, testified that, in his opinion, the necessity of Myers's four-level fusion surgery did not arise from the January 2014 collision. Instead, he opined that Myers would have needed the surgery at some point in the future, regardless of the collision because he suffered from arthritic degenerations, i.e., "bone spurs" that press on the spinal cord and are not caused by a traumatic injury. From Blacklock's review of Myers's imaging tests, he concluded that Myers did not have any herniated discs in his cervical spine. And he opined that Myers's initial motor and neurologic exams were inconsistent with an individual who had experienced a recent spinal cord injury.

Dr. Blacklock further testified that he is familiar with the costs associated with a four-level fusion surgery and the charges associated with Myers's surgery were not reasonable. First, he reviewed a bill from L2 Surgical regarding the

hardware that was put into Myers's spine for $33,195. Blacklock opined that this amount was unreasonable and the hardware should have cost between $3,000 and $5,000, at a maximum. Next, he reviewed a bill from Spring Central Hospital, where Myers had his surgery, in the amount of $201,570.54. Blacklock opined that this bill was also unreasonable and the cost for a four-level fusion surgery should have been $40,000, at a maximum. He then reviewed a bill from Dr. Kotecha, the surgeon who performed Myers's surgery, for $68,587.09. Blacklock opined that this charge was also not reasonable and should have cost no more than $3,000 to $16,000. Finally, he reviewed a bill from Sentry Neuromonitoring, LLC for the monitors used during Myers's surgery for $6,075.00. And Blacklock opined that this amount was approximately three times what he would expect to be charged for that type of equipment.

Richard Baratta, Ph. D., a biomedical engineering expert, testified that, from his review of the evidence in this case, the 18-wheeler could not have struck Myers at a speed of greater than three miles per hour. And he explained that a contact speed of three miles per hour or less was insufficient to herniate discs in a cervical spine unless there were pre-existing injuries present.

The jury found that the negligence of Sprint, Baggett, and Myers proximately caused Myers's injuries. It attributed sixty-four percent of the liability to Sprint, thirty-five percent to Baggett, and one percent to Myers. And the jury

12

awarded Myers damages in the amount of $315,000 for past medical expenses, $15,000 for past physical pain, $500,000 for future physical pain, $50,000 for future mental anguish,[1] $75,000 for past physical impairment, and $2,000,000 for future physical impairment. The trial court entered judgment on the verdict against Sprint and Montgomery.[2] Sprint filed post-trial motions for a judgment notwithstanding the verdict, to modify the verdict, and for a new trial, which were all denied. Montgomery paid its portion of the judgment, and Sprint appealed.

## Sufficiency of the Evidence

In its first, second, and fourth issues, Sprint contends that the evidence is legally and factually insufficient to support the jury's negligence finding against Sprint and its damages award to Myers of $2 million for future physical impairment and $500,000 for future pain. In its fifth issue, Sprint argues that the evidence is factually insufficient to support the jury's proportionate-responsibility findings.

### *Standard of Review*

We will sustain a legal-sufficiency, or "no-evidence," challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence

---

[1] The jury declined to award Myers damages for past mental anguish.
[2] The parties stipulated that Baggett was acting within the course and scope of his employment with Montgomery at the time of the collision.

13

offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id.* at 822. The term "inference" means:

> In the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved . . . .

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (quoting BLACK'S LAW DICTIONARY (5th ed. 1979)).

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (internal quotations omitted). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, the trier-of-fact

14

must be allowed to do so. *City of Keller*, 168 S.W.3d at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within th[e] zone of reasonable disagreement." *Id.*

When an appellant challenges the factual sufficiency of the evidence, we view all of the evidence in a neutral light and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The factfinder is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## *Liability*

In its first issue, Sprint argues that the evidence is legally and factually insufficient to support the jury's finding that Sprint was negligent and 64% responsible for Myers's injuries because he submitted a negligent-activity claim to the jury, there is no evidence that Sprint's spotters acted negligently at the time of the collision, and any inference that they did act negligently is "rendered no evidence" by equally probable inferences that they did not act negligently.

The elements of a negligence cause of action consist of the "existence of a legal duty, a breach of that duty, and damages proximately caused by the breach."

15

*Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 352 (Tex. 2015) (internal quotations omitted). "A general contractor in control of the premises may be liable for two types of negligence in failing to keep the premises safe: that arising from an activity on the premises, and that arising from a premises defect." *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 470 (Tex. 2017) (quoting *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997)). "Negligence and premises liability claims . . . are separate and distinct theories of recovery, requiring plaintiffs to prove different, albeit similar, elements to secure judgment in their favor." *Id.* at 471 (citing *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 775–76 (Tex. 2010)). "Underpinning the distinctions between these claims is the principle that 'negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe.'" *Levine*, 537 S.W.3d at 471–72 (quoting *Del Lago*, 307 S.W.3d at 776 (footnotes omitted)); *see also Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 388 (Tex. 2016) ("When distinguishing between a negligent activity and a premises defect, this Court has focused on whether the injury occurred by or as a contemporaneous result of the activity itself—a negligent activity—or rather by a condition created by the activity—a premises defect."). For a negligent-activity theory, a plaintiff generally need only

16

submit a general-negligence question to the jury, which is insufficient to support recovery in a premises-defect case. *Id.* at *4–5.

Here, the trial court, at Myers's request, submitted a general negligence question to the jury. Thus, only theories of negligent activity, not premises liability, are at issue. Sprint does not assert that it owed no duty to Myers in regard to its spotters who assisted Baggett in navigating the 18-wheeler when it hit Myers. Rather, it argues that it cannot be liable for negligence in this case because there is no evidence of any contemporaneous negligent activity by the spotters, "much less [of] an affirmative act of malfeasance," but only equally plausible inferences that amount to no evidence.

The evidence in the record supports a reasonable inference that the spotters breached their duty to exercise reasonable care in communicating with Baggett as he maneuvered the 18-wheeler and warning any bystanders about the 18-wheeler's movement.[3] Specifically, Baggett was not able to see anything behind him as he

---

[3] To the extent that Sprint argues that the alleged action, or inaction, of one of its spotters leading up to the collision was not sufficiently contemporaneous with the collision to support a claim for negligent-activity, the argument is without merit. The record reveals that, at most, one to two minutes passed from the time that Baggett hit the gate to the time that he drove away. Any action, or inaction, by a spotter would have occurred during that time frame and, thus, "[i]mmediately prior" to the collision. *See Tex. Dep't of Transp. v. Ramming*, 861 S.W.2d 460, 464–65 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (explaining "injuries suffered . . . did not arise from the 'absence, condition, or malfunction' of a traffic signal," but immediately after technician disconnected power source to traffic light and accident occurred while reconnecting it); *but see Oncor Elec. Delivery Co. v. Murillo*, 449 S.W.3d 583, 592 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)

17

was backing up the 18-wheeler, and he relied on the spotter outside of his window to guide him. This spotter had told Baggett that "he could see everything back there." There was a second spotter standing behind the trailer whom Baggett could not see. After Baggett hit the gate, he did not move for approximately one to two minutes, during which time Myers drove up on his four-wheeler. At this time, Myers took a photograph of the trailer's contact with the gate. And the second spotter is visible in this photograph, standing behind the 18-wheeler, but in front of Myers. At some point, before the spotter who could "see everything" gave Baggett the "all-clear" to drive off, the trailer of the 18-wheeler struck Myers. This evidence constitutes sufficient circumstantial evidence that supports the jury's negligence finding against Sprint in regard to the acts or omissions of its spotters.[4]

Sprint's argument that the "equal inference rule" nullifies any alleged evidence of its negligence is without merit. "Circumstantial evidence can establish actual knowledge but such evidence must 'either directly or by reasonable inference' support that conclusion." *Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015) (quoting *City of Corsicana v. Stewart*, 249 S.W.3d 412, 415 (Tex.

---

(holding negligence not contemporaneous where utility company's last action regarding transformer that shocked plaintiff "more than a month before . . . injury").

[4] To the extent that Sprint argues that Myers must prove an affirmative act of malfeasance, as opposed to an omission on the part of Sprint's spotters, to support liability, the argument is without merit because negligence may be established by acts or omissions. *E.g.*, *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017).

18

2008)).  However, "when circumstances are equally consistent with either of two facts, neither fact may be inferred."  *City of Keller*, 168 S.W.3d at 814 (quoting *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 805 (Tex. 1991)).

Sprint argues that because it is equally plausible that the spotters acted reasonably and cleared the area before Myers drove up, the inference that the spotters acted negligently in performing their duties is "rendered" no evidence by the equal inference rule.  However, this is not an equally plausible inference when considered in light of the evidence that Baggett was relying on the spotters to navigate the 18-wheeler, the spotter next to Baggett said he could see everything behind the 18-wheeler, and a picture that Myers took immediately before the collision shows that the second spotter was standing between him and the 18-wheeler.  Regardless, even assuming a reasonable inference could have been deduced in Sprint's favor, choosing "among opposing reasonable inferences" is a determination for the jury, which is "entitled to consider the circumstantial evidence, weigh witnesses' credibility, and make reasonable inferences from the evidence it chooses to believe."  *Lozano v. Lozano*, 52 S.W.3d 141, 149 (Tex. 2001) (Phillips, C.J., concurring to, and dissenting from, per curiam opinion on behalf of majority).

Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's negligence finding against Sprint.

We overrule Sprint's first issue.

### *Physical Impairment*

In its second issue, Sprint argues that the evidence is factually insufficient to support the jury's award of $2 million to Myers for future physical impairment because his "ranch-hand damages model" improperly presented an economic-damages model to the jury when only non-economic damages are proper for physical impairment. Sprint ultimately concedes that there is some evidence of future physical impairment aside from the "ranch-hand damages model."

In reviewing the factual sufficiency of a damages award, we consider all the evidence that bears on the challenged category of damages, even if the evidence also relates to another category of damages. *Golden Eagle*, 116 S.W.3d at 773. The fact-finder generally has discretion to award damages within the range of evidence presented at trial. *Gulf States Utils., Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002). It may not, however, "arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial." *First State Bank v. Keilman*, 851 S.W.2d 914, 930 (Tex. App.—Austin 1993, writ denied). A rational basis for the calculation must exist. *Id.*

Damages are measured by the question and instruction given in the court's charge. *Equistar Chems. L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007). In this case, the trial court asked the jury to determine an amount that would reasonably compensate Myers for past medical expenses, past and future physical pain, past and future mental anguish, and past and future physical impairment. It specifically instructed the jury to consider each element separately and to "not award any sum of money on any element if [it] ha[d] otherwise, under some other element, awarded a sum of money for the same loss" in order to prevent compensation "twice for the same loss." And we presume that the jury followed the charge. *Golden Eagle*, 116 S.W.3d at 771 (noting unless record demonstrates otherwise, appellate courts must presume jury followed instructions given in charge).

Because the charge in this case did not define "physical impairment," we measure the sufficiency of the evidence against the commonly-understood meaning of the term. *Barnhart v. Morales*, 459 S.W.3d 733, 745 (Tex. App.—Houston [14th Dist.] 2015, no pet.). The commonly-understood meaning of "physical" is "of or relating to the body." *Id.* (internal quotations omitted). And "impair" is commonly understood to mean "to diminish in quantity, value, excellence, or strength." *Id.* (internal quotations omitted). "More generally, Texas courts have recognized that physical impairment damages can compensate for physical injuries

21

that affect the plaintiff's activities or lead to loss of enjoyment of life." *Id.* (citing *Golden Eagle*, 116 s.W.3d at 765–67).

Sprint concedes that "nothing was wrong with the charge." However, it asserts that Myers improperly asked the jury to award economic damages for future physical impairment during closing argument when he asked the jury to award $1.5 million based on his "ranch-hand damages model." However, Sprint did not object to this jury argument at trial and, therefore, any challenge to the impropriety of the argument is waived. *See Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009) ("Appellate complaints of improper jury argument must ordinarily be preserved by timely objection and request for an instruction that the jury disregard the improper remark."). And this is certainly not the type of incurable argument that may be raised for the first time on appeal as it could have easily been cured by an "instruction from the court or retraction of the argument" had Sprint alerted the trial court to the alleged error. *See Living Ctrs. of Tex., Inc. v. Peñalver*, 256 S.W.3d 678, 681 (Tex. 2008). Regardless, "[s]tatements from lawyers as to the law do not take the place of instructions from the judge as to the law." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009).

Myers presented evidence of future disfigurement, which was not separately submitted to the jury. Disfigurement can include surgical scars, even if they are in

a location usually covered by clothing, or anything else that "impairs the appearance of a person, or that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Figueroa v. Davis*, 318 S.W.3d 53, 64 (Tex. App.—Houston [1st Dist.] 2010, no pet) (quoting *Doctor v. Pardue*, 186 S.W.3d 4, 18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)); *see also Diamond Offshore Servs., Ltd. v. Williams*, 510 S.W.3d 57, 76–77 (Tex. App.—Houston [1st Dist.] 2015) (affirming award of $350,000 for future disfigurement where plaintiff suffered from "foot drop" due to nerve damage, could not extend his toes, dragged his foot when he walked, and suffered from noticeable limp), *rev'd on other grounds*, 542 S.W.3d 539 (Tex. 2018). The evidence in this case reveals that Myers has surgical scarring with the risk that he could have to undergo more surgery, and, thus, become further scarred in the future. Moreover, the jury heard testimony from Myers and Dr. Kotecha of muscle atrophy in Myers's right arm due to nerve damage from the injury. At trial, Myers took off his jacket and showed the jury that, compared to his left arm, his right arm was diminished and shrunken from the injuries he sustained. He could not lift more than ten pounds with his right arm. And although Dr. Kotecha testified that the atrophy could possibly improve with therapy, he explained that it would not improve if there was permanent nerve damage.

There is also evidence of Myers's future loss of earning capacity, which was not separately submitted to the jury. Before his injuries, Myers worked many jobs, including as an ironworker, mechanic, "hotshot" driver, and bodyguard. And he operated a gun range on his property. Due to his diminished strength and mobility, the jury could have reasonably inferred that Myers could no longer work many of these jobs, particularly that of a bodyguard, in the future.

Myers Further submitted evidence generally of his loss of enjoyment of life, which is the most common type of future physical-impairment damage and includes anything that extends "beyond any pain, suffering, mental anguish, lost wages, or diminished earning capacity." *Golden Eagle*, 116 S.W.3d at 772. He was only 45 years old at the time of trial, but testified that his injuries have made him "feeble" and he has had to "completely and totally re-adjust" his life. As a result of his injuries, he no longer has full range of mobility in his neck. And the injuries have altered his "regular interaction" with his 10-year-old daughter, whom he cannot let run up and hug him and he cannot carry on his shoulders. Myers is not able to coach her soccer team or participate in activities with her as he had done before.

Further, Myers testified that he can no longer perform much of the day-to-day maintenance on his ranch that he used to handle on his own and was

24

taught how to do by his grandfather, from whom he inherited the ranch.[5]  As a result, Myers's ranch was deteriorating.  He can use a riding lawn mower and perform some tasks, but he cannot operate and service the heavy equipment needed to cut, rake, bale, haul, and stack hay and to do most of the other regular work around the ranch.  Myers described the impact of his injuries as effectively robbing him of his once active lifestyle and turning him "into an old man."

Sprint argues that the award of damages for future physical impairment is insupportable because Myers, at the time of trial, had resumed many of his daily activities, did not complain of pain, and had not been back to a doctor.  However, the jury heard the above-discussed testimony, and it was within its province to determine what weight to give the testimony in reaching its determination.  *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998) ("The court of appeals is not a fact finder" and "may not pass upon the witnesses' credibility or substitute its judgment for that of the jury, even if the evidence would clearly support a different result").

Aside from its attack on Myers's "ranch-hand damages model," Sprint does not address how the remainder of Myers's evidence is insufficient to support the award for future physical impairment.  Instead, Sprint cites to several cases in

---

[5]     Sprint's challenge is only to the economic-damages "model" presented by Hurst in an attempt to quantify non-economic damages through expert testimony.  It concedes that "[p]hysical impairment damages can compensate a plaintiff for *not* being able to work, and the lost satisfaction therefrom."

25

support of its assertion that "the jury's award is out of line with awards from other cases." But "[a]n award of future damages in a personal injury case is always speculative." *Pipgras v. Hart*, 832 S.W.2d 360, 365 (Tex. App.—Fort Worth 1992, writ denied). And "[m]atters of pain and suffering, mental anguish, physical impairment, and loss of consortium are necessarily speculative, and . . . particularly within the jury's province to resolve . . . and determine the amounts attributable thereto." *Lanier v. E. Founds., Inc.*, 401 S.W.3d 445, 455 (Tex. App.—Dallas 2013, no pet.).

"Because the measure of damages in a personal injury case is not subject to precise mathematical calculation, each case must be measured by its own facts, and considerable latitude and discretion are vested in the jury." *U-Haul Int'l, Inc. v. Waldrip*, 322 S.W.3d 821, 855–56 (Tex. App.—Dallas 2010), *rev'd in part on other grounds*, 380 S.W.3d 118 (Tex. 2012). Therefore, comparison with other cases or amounts of verdicts is "generally of little or no help." *Id.* at 856. And, as Sprint admits, other courts of appeals have upheld significant awards for physical impairment. *E.g.*, *id.* (affirming $5 million award for future physical impairment); *Casas v. Paradez*, 267 S.W.3d 170, 189–90 (Tex. App.—San Antonio 2008, pet. denied) (affirming $7 million award for physical impairment, not specifying past or future); *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 554–55 (Tex. App.—Fort

Worth 2006, pet. denied) (affirming $3.5 million award for future physical impairment).

Even viewing the evidence without the "ranch-hand damages model,"[6] we conclude that the jury's award for future physical impairment is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. Accordingly, we hold that the evidence is factually sufficient to support the jury's award of damages for future physical impairment.

We overrule Sprint's second issue.

### *Future Pain*

In its fourth issue, Sprint argues that the evidence is legally and factually insufficient to support the jury's award of $500,000 in damages for future physical pain to Myers because he presented no evidence of future medical expenses, he did not complain about pain, and his doctor did not prescribe pain medication for him.

A plaintiff may recover for future physical pain if a jury can reasonably infer that he will feel physical pain in the future. *See Figueroa*, 318 S.W.3d at 62–63. And physical pain may be established by circumstantial evidence. *Id.* "The process of awarding damages for amorphous, discretionary injuries such as mental

---

[6] Because we conclude that factually-sufficient evidence aside from the "ranch-hand damages model" supports the jury's award, we need not address Sprint's argument that the model was improperly considered as part of the jury's future physical impairment award. *See* TEX. R. APP. P. 44.1. Similarly, we need not address Sprint's claim that the trial court erred in admitting Hurst's expert testimony. *See id.*

anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Id.* at 62 (quoting *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.)). "Once the existence of some pain . . . has been established, there is no objective way to measure the adequacy of the amount awarded as compensation, which is generally left to the fact finder." *Id.* (quoting *Pentes Design, Inc. v. Perez*, 840 S.W.2d 75, 80 (Tex. App.—Corpus Christi 1992, writ denied)). Accordingly, the fact finder "is given a great deal of discretion in awarding an amount of damages it deems appropriate for pain and suffering." *Id.* at 62–63 (quoting *Johnston*, 178 S.W.3d at 871).

Here, the evidence demonstrates that Myers's injuries included six cervical-disc herniations and a compressed spinal cord. Even after his four-level fusion surgery, two of his herniated discs remained untreated. Dr. Kotecha testified that he "hopes" the remaining two discs will heal on their own, but there is no guarantee that they will, and it could take up to four years for them to heal. Further, while Myers did not need any prescription pain medications at his last follow-up visit with Kotecha, his lifting of anything heavier than 20-30 pounds or any repetitive bending, twisting, or lifting motions, which would be normal actions for someone living on a ranch or with a young child, could subject him to further injury. And if the two untreated discs do not heal, Myers could need additional

28

surgeries to correct them. Even Sprint's own expert, Dr. Blacklock, opined that Myers will continue to experience pain in the future, although he disputed that Myers's injuries were caused by the collision.

The record in this case reveals that Myers will continue, within a reasonable probability, to experience pain in the future. That he did not require prescription pain medicine at the time of trial or that surgery in the future is not guaranteed does not negate the jury's finding of future physical pain in this case.[7] *See Figueroa*, 318 S.W.3d at 63–64 (risk of future surgery sufficient to support award of future pain and suffering); *PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 518 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (upholding award for damages for future pain and suffering even though doctor "could not say with certainty exactly how long [plaintiff's] injuries would last or predict with certainty whether they would be permanent," where "no witness expressed doubt that [plaintiff] would continue to suffer physical pain in the future"). Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's award of damages for future pain. *See Figueroa*, 318 S.W.3d at 62–63 (explaining jury "is given a great deal of discretion in awarding an amount of damages it deems appropriate for pain and suffering").

---

[7]  There is no basis in the law or record in support of Sprint's assertion that Myers's failure to seek recovery for future medical expenses negates the inference that he could experience pain requiring, and then resulting from, a surgery in the future.

29

We overrule Sprint's fourth issue.

## *Apportionment Findings*

In its fifth issue, Sprint argues that the evidence is factually insufficient to uphold the jury's proportionate liability finding because it is "undisputed that Myers drove his four-wheeler to within 70 feet of the gate" before the collision, did not tell anyone he was there, saw the 18-wheeler had its brake lights on, "and nevertheless turned away to talk on his cell phone."

"[T]he jury is given wide latitude in determining the negligent parties' proportionate responsibility." *Jackson v. Williams Bros. Constr. Co.*, 364 S.W.3d 317, 325 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). "[W]e may set aside the jury's determination of proportionate responsibility only if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* And, "[e]ven if the evidence could support a different percentage allocation, we may not substitute our judgment for that of the jury." *Id.*

In its reply brief, Sprint concedes that this argument is "a corollary argument to the equal inference rule discussed" in regard to its challenge to the jury's liability finding, which we overruled. Because the evidence supporting the jury's negligence finding is factually sufficient, we further hold that the evidence supporting the jury's assignment of 64% responsibility to Sprint is also sufficient.

We overrule Sprint's fifth issue.

30

*Medical Expenses*

In its third issue, Sprint argues that the trial court erred in admitting and excluding certain evidence regarding the billing practices at Spring Central Hospital because it is relevant to the "reasonableness" of Myers's medical expenses.

The decision to admit or exclude evidence lies within the sound discretion of the trial court. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). We will uphold a trial court's evidentiary ruling if any legitimate ground supports the ruling, even if the ground was not raised in the trial court. *Hooper v. Chittaluru*, 222 S.W.3d 103, 107 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). And we will not reverse an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment or prevented a proper presentation of the appeal. *See* TEX. R. APP. P. 44.1(a); *Sw. Elec. Power Co. v. Burlington N. R.R.*, 966 S.W.2d 467, 474 (Tex. 1998). In determining whether the erroneous admission or exclusion of evidence probably resulted in the rendition of an improper judgment, we review the entire record, and, "[t]ypically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the

judgment turns on the particular evidence excluded or admitted." *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). Ordinarily, we will not reverse a judgment because a trial court erroneously excluded evidence if the evidence in question is cumulative and not controlling on a material issue dispositive to the case. *Id.*

"In addition to any other limitation under law, recovery of medical or health care expenses incurred is limited to the amount actually paid or incurred by or on behalf of the claimant." TEX. CIV. PRAC. & REM. CODE § 41.0105 (Vernon 2014). In a Medicare Part B case, the Texas Supreme Court first interpreted this statutory language and ultimately determined that the introduction into evidence of the total amounts initially billed by healthcare providers was error because federal law prohibits them from charging Medicare patients more than Medicare deems reasonable. *Haygood v. De Escabedo*, 356 S.W.3d 390, 392, 398–99 (Tex. 2011). Specifically, although the health care providers billed Haygood for $110,069.12, they had no right to recover this amount under federal law, pursuant to Medicare, and they ultimately adjusted their bill downward, reducing the total amount owed by Haygood to $27,739.43. *Id.* at 392. The supreme court interpreted the "actually paid and incurred" language of section 41.0105 to mean "expenses that have been or will be paid, and exclud[ing] the difference between such amount and charges the service provider bills but has no right to be paid." *Id.* at 396–97. Thus, it held

32

that the trial court had erred in admitting evidence of the original amounts charged where the healthcare providers were not legally entitled to be paid those amounts and the probative value of the evidence was substantially outweighed by the confusion it was likely to generate. *Id.* at 398. The court explained that "only evidence of recoverable medical expenses is admissible at trial." *Id.* at 399.

In part of its third issue, Sprint argues that, in contravention of *Haygood*, the trial court erred in admitting evidence of the amount charged to Myers as opposed to the amount actually paid or "written off." However, the factual scenario presented in this case is substantively distinguishable from *Haygood* in that Myers's bill was not limited by Medicare, but was instead assigned to MedFin, a "factoring" company. "Factoring is a process by which a business sells to another business, at a . . . discount, its right to collect money before the money is paid." *Houston Lighting & Power Co. v. City of Wharton*, 101 S.W.3d 633, 636 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). It is "a financing tool that reduces the amount of working capital a business needs by reducing the delay between the time of sale and the receipt of payment." *Id.*

In contrast to *Haygood*, there is no evidence in this case that there was a contract in place that prohibited Spring Central Hospital from charging Myers for the full value of the services rendered or preventing MedFin, as an assignee of Spring Central Hospital, from collecting the full value of the services rendered.

33

*See Amigos Meat Distribs., L.P. v. Guzman*, 526 S.W.3d 511, 524–25 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (rejecting similar claims in a factoring case); *Katy Springs & Mfg. v. Favalora*, 476 S.W.3d 579, 601–02 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (same). There is similarly no evidence in the record that Myers was not liable for payment in full for the bill, regardless of whether Spring Central Hospital or MedFin ultimately accepted less than full payment. *See Big Bird Tree Serv. v. Gallegos*, 365 S.W.3d 173, 177 (Tex. App.—Dallas 2012, pet. denied) (holding indigent plaintiff who received medical care free of charge entitled to recover damages for full amount billed where no evidence of contract prohibiting hospital from charging full value and evidence demonstrated patient required to pay if obtained recovery in law suit).

Accordingly, we hold that the trial court did not err in admitting evidence of the full amount of the bill that Spring Central Hospital charged to Myers.

In the remaining portion of its third issue, Sprint argues that the trial court erred in excluding a portion of the deposition testimony of Dooley, the former Director for the Business Office of Spring Central Hospital, regarding the hospital's practice of "mark[ing] up the bills by 400%," "usually accept[ing] 25-40% of the amount charged," and having "negotiated a 40% rate with MedFin" before it performed any services for Myers. Sprint asserts that this evidence should have been admitted for the jury to consider in assessing the reasonableness

34

of Myers's medical expenses. Myers asserts that "the size of the discount is not relevant to the reasonableness of the expenses." However, Dooley's excluded testimony establishes that Spring Central Hospital charged Myers in excess of $200,000 for his surgery when it had already negotiated to accept $80,711 for the surgery from MedFin in exchange for assignment of Myers's bill. Thus, this evidence should have been admitted as relevant to the issue of the reasonableness of the medical expenses for Myers's surgery charged by Spring Central Hospital. Accordingly, we hold that the trial court erred in excluding it.

Further, because Dooley worked in the billing department at Spring Central Hospital, the jury likely would have given her testimony more weight than that of Dr. Blacklock, who was a defense-paid expert and the only witness to opine that the expenses were unreasonable.[8] *See Chittaluru*, 222 S.W.3d at 111 ("[H]ired experts risk being perceived by the jury as interested in providing testimony helpful to the party paying them."). Accordingly, we further hold that the trial court's error in excluding Dooley's testimony was harmful. *See id.* at 111–12.

---

[8] For similar reasons, we are unpersuaded by Myers's argument, in his post-submission briefing, that the trial court "could have properly excluded" this evidence as cumulative of Dr. Blacklock's testimony or because "the risk of confusing or misleading the jury substantially outweighed the evidence's probative value." Dooley's testimony, as a fact witness and the employee who created the bills for Spring Central Hospital, that she marked up bills by 400% is unique from the testimony of Blacklock that, in his expert opinion, the fees charged by Spring Central Hospital were unreasonable. The testimony is not so confusing as to outweigh its probative value in this case. *See* TEX. R. EVID. 403.

We sustain, in part, Sprint's third issue.

## Conclusion

We reverse, in part, the portion of the trial court's judgment awarding Myers damages for past medical expenses, and we remand the case to the trial court for a new trial on the issue of past medical expenses.[9]  We affirm the remainder of the trial court's judgment.

Terry Jennings
Justice

Panel consists of Justices Jennings, Keyes, and Higley.

---

[9]    *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 86 (Tex. 1992) (remanding to trial court for "new trial on the issue of lost profits"); *Jackson v. Gutierrez*, 77 S.W.3d 898, 904 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (remanding limited damages issues). *Cf. Whitaker v. Rose*, 218 S.W.3d 216, 224 (Tex. App—Houston [14th Dist.] 2007, no pet.) (remanding "all of the damage awards" where awards not separable).

36