**Opinion issued December 19, 2019.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00096-CV

————————————

**ALAN SCHROCK, Appellant**

**V.**

**AMEGY BANK OF TEXAS, N.A., AND ZB, N.A. D/B/A AMEGY BANK,**
**Appellees**

---

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-85775**

---

## MEMORANDUM OPINION

This is an appeal from the trial court's summary judgment dismissing Alan Schrock's claims against Amegy Bank of Texas, N.A. and ZB, N.A. d/b/a Amegy Bank (collectively, "Amegy"). After many years of serving as Schrock's bank, Amegy began to suspect that Schrock might be structuring his cash deposits to

avoid federal reporting requirements. Amegy notified Schrock of its concerns, warned him that the continued appearance of structuring could result in the closure of his accounts, and urged him to contact his account manager to discuss the matter further. Schrock did not contact his account manager and continued to make the concerning deposits. As a result, Amegy froze the accounts and sent Schrock notice that the accounts would be permanently closed in 30 days.

The freeze to Schrock's accounts disrupted his professional and personal life, and he sued Amegy for breach of contract and negligence. Both claims were predicated on Schrock's contention that Amegy violated the parties' Deposit Agreement by freezing his accounts without giving him prior notice. But the Deposit Agreement expressly permits Amegy to freeze an account before giving notice when, as here, Amegy suspects fraudulent activity on the account. Because Amegy had the right to freeze Schrock's accounts before giving him notice, Schrock's claims fail as a matter of law. Therefore, we affirm.

**Factual Background**

This case arises from Amegy's decision to freeze and then close the accounts of one of its longtime depositors, Alan Schrock. Schrock is a landlord who owns various properties in and around Baytown, Texas. For many years, Schrock had two bank accounts with Amegy: a checking account and a savings account. Both accounts were governed by a Deposit Agreement. As relevant here,

2

Paragraph 2 granted Amegy the right to close the accounts upon reasonable notice to Schrock:

> We may also close this account at any time upon reasonable notice to you and tender of the account balance personally, by mail, or by electronic transfer. Items presented for payment after the account is closed may be dishonored. Reasonable notice depends on the circumstances, and in some cases it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, or upon any refusal to provide us additional information requested about you, your account or your transactions, we may immediately freeze or close your account and then give you notice.

In 2016, Amegy noticed that Schrock was making multiple cash deposits and grew concerned that Schrock might be structuring his deposits to avoid federal reporting requirements. To safeguard the financial industry from money laundering and other financial crime, federal law requires financial institutions to report currency transactions over $10,000 as well as multiple currency transactions that aggregate to be over $10,000 in a single day. Federal law makes it a crime to structure transactions for the purpose of evading these reporting requirements.

Amegy sent Schrock a letter, dated March 2, 2016, notifying him that his cash deposits potentially violated federal reporting requirements. The letter began by explaining Amegy's currency transaction reporting obligations under federal law and Amegy's obligation to ensure that cash transactions with the bank are not structured to avoid reporting requirements:

As part of the Bank Secrecy Act (BSA) of 1970, Amegy Bank and other U.S. financial institutions are required to assist government agencies in detecting and preventing money laundering. Legally, Amegy Bank must keep records of large customer cash transactions, presently amounts in excess of $10,000,00, and must monitor all cash transactions to ensure they are not purposely "structured" in amounts less than $10,000.00 to avoid the reporting requirements.

The letter asked Schrock to conduct his "cash transactions in a manner that will avoid future conflicts with BSA reporting requirements." The letter warned that future conflicts with reporting requirements could result in Amegy closing his account. And the letter urged Schrock to contact his account relationship manager, Crystal Stevenson, to discuss the requirements as they related to Schrock's banking activity.

After he received the letter, Schrock contacted his local branch customer service representative, Augustine St. Romain, who told Schrock that he "had nothing to worry about because the bank sends out these types of letters all the time." However, Schrock did not contact Stevenson, and he continued to make multiple cash deposits.

Nearly five months later, Amegy sent Schrock a second letter, dated July 26, 2016, and titled "Second Notification," notifying him once again that his cash deposits potentially violated federal reporting requirements. The letter asked Schrock to "consider conducting [his] cash transactions in a manner that will avoid any future conflicts with [the] reporting requirements." The letter warned that

4

continued conflicts, including "the appearance of 'structuring'," could result in the closure of Schrock's accounts. And the letter urged Schrock to visit his local branch or contact Stevenson to learn more about the various options available for his cash transactions.

As before, after he received the second letter, Schrock contacted St. Romain, who told Schrock that he "must be doing something wrong with [his] cash transactions" but "could not give [him] any specifics as to what [he] was doing wrong or how [he] could avoid [his] account being closed." Schrock did not contact Stevenson. Nor did Schrock otherwise attempt to explain to Amegy that he was a landlord and that his multiple cash deposits were rental income from his various tenants.

Due to Schrock's continued problematic cash deposits and his failure to contact Stevenson, Amegy decided to close his accounts. On November 14, 2016, Amegy froze Schrock's checking and savings accounts. A letter notifying Schrock of Amegy's decision was mailed to Schrock's home address that same day. The letter stated that Amegy would wait 30 days until December 24, 2016, to close the accounts and instructed Schrock to immediately stop writing checks against the account and stop using his checking account debit card.

The same day this letter was sent, Schrock tried to conduct an ATM transaction using his checking account debit card. But because Amegy had already

5

deactivated the card, Schrock was unable to complete the transaction. Schrock went to his local Amegy branch to inquire about the matter. There, he met with Stevenson, who gave him a copy of the letter informing him of the account closure.

The next day, Schrock closed his savings account with Amegy. A day or two later he opened an account at Woodforest Bank. Amegy closed Schrock's checking account on December 14, 2016, the same day Schrock filed this lawsuit and 10 days earlier than the date specified in the letter. All money remaining in the account was returned to Schrock.

## Procedural History

Schrock sued Amegy for breach of contract, alleging that Amegy breached the parties' Deposit Agreement "by failing to give reasonable notice before preventing [Schrock] from using his accounts and by rejecting checks and automatic payments when there were sufficient funds in the account to cover the payments." Schrock also sued Amegy for negligence, arguing that Amegy's breaches of the Deposit Agreement also gave rise to tort liability because Amegy had a duty to exercise reasonable care in performing under the Deposit Agreement.

Amegy moved for summary judgment, arguing, among other things, that Schrock's claims fail as a matter of law because Paragraph 2 of the Deposit Agreement granted Amegy the right to freeze Schrock's accounts before providing him notice that the freeze was in effect. Amegy supported its motion with various

6

exhibits, including (1) the Deposit Agreement, (2) the three letters that Amegy sent to Schrock, (3) an affidavit from Stevenson, and (4) excerpts from Schrock's deposition.

After a hearing, the trial court granted Amegy's motion without stating the grounds for its ruling and dismissed Schrock's claims.

Schrock appeals.

## Summary Judgment

Because it is dispositive, we begin with Schrock's second issue, in which he contends that the trial court erred to the extent it granted summary judgment based on Amegy's argument that its conduct complied with the Deposit Agreement.

### A.  Standard of review

We review a trial court's grant of summary judgment de novo. *Shawn Ibrahim, Inc. v. Houston-Galveston Area Local Dev. Corp.*, 582 S.W.3d 753, 763 (Tex. App.—Houston [1st Dist.] 2019, no pet.). To prevail on a traditional summary judgment motion, the movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Shawn Ibrahim, Inc.*, 582 S.W.3d at 763. When a defendant moves for traditional summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of an affirmative defense, thereby defeating the plaintiff's

7

cause of action. *Shawn Ibrahim, Inc.*, 582 S.W.3d at 763. If the movant carries this burden, the burden shifts to the nonmovant to raise a genuine issue of material fact. *Id.*

We review the evidence presented in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Id.* We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.* When, as here, the trial court's summary judgment does not state the basis for the court's decision, we must uphold the judgment if any of the theories advanced in the motion are meritorious. *Donaldson v. Texas Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 432 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

## B.    Analysis

In his petition, Schrock asserted claims for breach of contract and negligence.[1] Each claim was predicated on the same alleged misconduct: Amegy's failure to provide "reasonable notice" of its decision to close Schrock's accounts as required by Paragraph 2 of the Deposit Agreement. Thus, if Amegy proved that it complied with Paragraph 2, then Amegy conclusively negated an essential element of each of Schrock's claims: breach of a duty. *See Primoris Energy Servs. Corp. v.*

---

[1]    We note that Schrock also asserted a claim for gross negligence, which is not separable from a claim for negligence. *See First Assembly of God, Inc. v. Tex. Utils. Elec. Co.*, 52 S.W.3d 482, 494 (Tex. App.—Dallas 2001, no pet.) ("[O]ne's conduct cannot be grossly negligent without being negligent.").

8

*Myers*, 569 S.W.3d 745, 755 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (elements of negligence claim include breach of legal duty); *Garcia v. Sasson*, 516 S.W.3d 585, 592 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (elements of breach-of-contract claim include breach of contractual duty).

We begin with Paragraph 2's text. *BankDirect Capital Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex. 2017) ("The text is the alpha and the omega of the interpretive process."). Paragraph 2 provides, in relevant part:

> We may also close this account at any time upon reasonable notice to you and tender of the account balance personally, by mail, or by electronic transfer. Items presented for payment after the account is closed may be dishonored. Reasonable notice depends on the circumstances, and in some cases it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, or upon any refusal to provide us additional information requested about you, your account or your transactions, we may immediately freeze or close your account and then give you notice.

For present purposes, Paragraph 2 contains three key provisions. The first states: "We may also close this account at any time upon reasonable notice to you . . . ." This provision grants Amegy a right—the right to close Schrock's accounts "at any time." But it also imposes a duty—the duty to provide Schrock "reasonable notice" in the event it decides to do so. And the use of the preposition "upon" suggests that Amegy must fulfill the duty before exercising the right—that is, that Amegy must provide notice before (and not after) it closes the accounts. The second provision, however, clarifies that post-cancellation notice is reasonable in

9

at least some circumstances: "Reasonable notice depends on the circumstances, and in some cases it might be reasonable for us to give you notice after the change or account closure becomes effective." The third provision, most critically, provides an example of when post-cancellation notice is reasonable: "For instance, if we suspect fraudulent activity with respect to your account . . . we may immediately freeze or close your account and then give you notice."

Thus, under Paragraph 2 of the Deposit Agreement, if Amegy suspected fraudulent activity on Schrock's accounts, Amegy could immediately freeze or close the accounts before giving Schrock notice—which is exactly what Amegy did here. Schrock nevertheless argues that whether Amegy provided "reasonable notice" is a material fact issue precluding summary judgment because Amegy presented no evidence that it ever suspected fraudulent activity on Schrock's account. We disagree.

First, there were the multiple cash deposits made to Schrock's checking account, which were indicative of structuring and could therefore give rise to a reasonable suspicion of fraudulent activity. Second, there were Amegy's letters, dated March 2 and July 26, 2016, respectively, which warned Schrock that his cash transactions were potentially in conflict with federal reporting requirements and that continued potential conflicts, including "the appearance of 'structuring'," could result in the closure of his accounts. Third, there was Schrock's deposition,

10

in which he admitted that he knew from the letters that Amegy believed there was an "issue" with his accounts; that he knew Amegy might close his accounts if the issue was not resolved; that he nevertheless continued to make multiple cash deposits after receiving the letters; and that never tried to explain to Amegy that "all these daily cash deposits were rental income" because he did not think that was "any of [Amegy's] business." Considered together, these three pieces of evidence reflect that Amegy suspected fraudulent activity on Schrock's accounts—and that Schrock was aware of Amegy's concerns yet did nothing to assuage them.

We hold that the evidence shows that Amegy "suspect[ed] fraudulent activity with respect to [Schrock's] account[s]" and that Amegy therefore had the right under Paragraph 2 of the Deposit Agreement to "immediately freeze or close [the] account[s] and then give [him] notice." Because Amegy had the right to freeze or close the accounts before giving Schrock notice, Amegy did not breach the Deposit Agreement as a matter of law. Because Schrock's claims were predicated on Amegy's alleged breach, both claims fail as a matter of law. Accordingly, we overrule Schrock's second issue.[2]

---

[2] Because our resolution of Schrock's second issue is dispositive, we do not reach his first or third issues, in which he contends that the trial court erred to the extent it granted summary judgment on the other grounds advanced in Amegy's motion.

## Conclusion

We affirm the trial court's judgment.

Gordon Goodman
Justice

Panel consists of Justices Keyes, Goodman, and Countiss.