**Opinion issued May 20, 2021**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00346-CV

————————————

**FOUR J'S COMMUNITY LIVING CENTER, INC. AND ANTHONIA UDUMA, Appellants**

**V.**

**PATTI J. WAGNER, AS GUARDIAN OF JENNY ANN WAGNER, AN INCAPACITATED ADULT, Appellee**

---

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-40925**

---

## O P I N I O N

Appellants, Four J's Community Living Center, Inc. ("Four J's") and Anthonia Uduma, challenge the trial court's judgment, entered after a jury trial, in

favor of appellee, Patti J. Wagner, as guardian of Jenny Ann Wagner ("Jenny"), an incapacitated adult, in Wagner's suit for negligence. In three issues, Four J's and Uduma contend that the evidence is legally insufficient to support the jury's finding that Uduma is personally liable for negligence either as a landlord or as an agent of Four J's, the evidence is factually insufficient to support the jury's award of damages for past and future disfigurement and past and future physical pain and mental anguish, and the trial court erred in not applying the damages cap under Texas Civil Practice and Remedies Code section 74.301 as to Four J's.[1]

We affirm.

### Background

In her second amended petition, Wagner, Jenny's mother and legal guardian, alleged that on September 4, 2008, Jenny was severely burned in a fire at a four-bedroom residential care facility ("the facility") for disabled adults, operated by Four J's and Uduma, the president, chief executive officer, and sole shareholder of Four J's and the owner of the facility, which she leased to Four J's. Jenny, a resident of the facility, was thirty-five years old when the fire occurred. She has been legally blind since infancy, has cerebral palsy, and is profoundly intellectually disabled. Jenny shared the facility with three other adult residents. Jenny and

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.301 ("Limitation on Non[-]economic Damages").

2

another resident, Tanya James ("Tanya"), both "had the mental capacity of small children." The two other residents, Elisha Campbell and Esperanza Arzola, had milder intellectual disabilities but serious mental illnesses.

Wagner alleged that on September 4, 2008, Four J's and Uduma inadequately supervised Arzola, who obtained a cigarette lighter and started a fire in her bedroom at the facility. When the fire spread to the rest of the facility, Jenny, who was wheelchair-bound and incapable of escaping the fire without assistance, sustained smoke-inhalation injuries and second- and third-degree burns to her face, neck, chest, arms, and hands. She was hospitalized in a burn-trauma center for one month and endured painful treatments. The burns permanently scarred and disfigured Jenny. Tanya, who was also severely burned in the fire, died from her injuries.

Wagner brought negligence claims against Four J's and Uduma. She asserted that Four J's and Uduma breached the standard of care for a residential care facility by inadequately supervising Arzola; failing to equip the facility with properly functioning fire-detection and prevention systems, such as smoke detectors and overhead sprinkler systems; and failing to adequately train staff members to respond to a fire at the facility. And because it was reasonably foreseeable that if a resident came into possession of a cigarette lighter, a fire would likely result, Four J's and Uduma breached their duty to ensure that Jenny was safe from foreseeable harm caused by other residents who were unable to understand the dangers of incendiary

3

devices. The sole staff member on duty at the time of the fire, Amuche Chinelo Udemezue, had run from the facility without trying to assist Jenny. Wagner also asserted that the breaches of the standard of care by Four J's and Uduma proximately caused Jenny to inhale smoke and sustain second- and third-degree burns, a month-long hospitalization, painful debridement of wounds, tube feeding due to inhalation injuries, and permanent scarring and disfigurement. And Uduma was jointly and severally liable for the wrongful and negligent conduct of Four J's because it is her alter ego.

Four J's and Uduma answered, generally denying Wagner's allegations and asserting various affirmative defenses, including that their actions and omissions did not constitute "a proximate or producing cause" of Jenny's injuries. Rather, Jenny's injuries were caused by "the intervening actions of an independent, responsible third party," namely Arzola, "who started the fire in question." Four J's and Uduma also asserted that the damages cap in Texas Civil Practice and Remedies Code section 74.301 applied to this case.

At trial, Wagner testified that Jenny has been diagnosed with spastic cerebral palsy affecting all four limbs; she has only minor use of one hand. She has severe to profound intellectual disability and is legally blind. Jenny has used a wheelchair since she was three years old.

4

Jenny has a habit of talking to herself "in kind of strange ways." She can express her needs in one- or two-word responses to questions. For example, if she is asked, "Are you hungry?" she can answer, "Yes." And Jenny can make simple choices. For example, if Wagner asks her, "Do you want a hamburger, or do you want a cheeseburger?" she will answer "hamburger" or "cheeseburger." Occasionally when she means "yes," she will repeat the question. If she means "no," she says "no." The way Jenny communicates suggests that "she has more understanding than expressive language."

Wagner first learned Jenny was in the hospital the morning after the fire. Wagner went directly to the hospital and found out that Jenny "was already in the burn [intensive care unit ("ICU")] upstairs." When Wagner reached the ICU, she found Jenny unconscious and "propped up" in a hospital bed. Jenny "had bandages that went around her head and covered the whole side of her . . . face" and neck. And she had bandages covering "both arms and hands" and "bandages around her chest." Jenny was "on a respirator" and had a "tube coming out of her that was connected to . . . a vacuum pump, and it was pumping . . . blood and black soot out of her lungs." She had a feeding tube, an intravenous line in her groin, and "was on a morphine drip." Jenny was also connected to a heart monitor, had an oxygen monitor on her finger, and had "a blood pressure cuff . . . on her ankle."

When Jenny was well enough to undergo surgery, the doctors removed seven strips of skin from Jenny's thighs, which they used for skin grafts on her left breast, upper right arm, left hand, left wrist, and across her abdomen. Jenny also had burns on her neck and the right side of her face, her right eyelid, and her right ear. In some of those places, where the burns were less extensive, the doctors cut out the burned skin, stretch the incision closed, and staple it shut.

While in the hospital, Jenny was kept unconscious and on the respirator for two weeks. Wagner would visit Jenny during the daytime. But "[i]n the evening, they—they tell the family, 'You might as well go home' because that's when they do the debridement, scrap[ing] the dead skin off from the burns" and "they don't want" family members to see that painful process. In addition, the hospital staff "would close down the center" twice a day when "they would remove bandages, . . . clean the wounds[,] and then replace bandages."

After Jenny's respiratory tube and feeding tube were removed, and hospital staff "started giving her food by mouth," Wagner "could hear Jenny grinding her teeth," a behavior that Wagner understood as meaning "that [Jenny] was very uncomfortable and in pain in some way."

When Jenny was released from the hospital in early October 2008, Wagner brought her to Wagner's apartment. Wagner has been Jenny's caretaker, since the fire, which is "a full-time job." Wagner and her sister had to learn "how to do the

bandage changes," "administer [Jenny's] . . . medication, [and] make sure everything was cleaned and sterile." They had to change Jenny's diapers and give her sponge baths. A visiting nurse came in every morning to take care of the skin grafts and to monitor Jenny's vital signs and conditions. Jenny took Vicodin for pain "[e]very four hours for probably the first two weeks" after her release, "at least, and then maybe every six hours thereafter." When Jenny stopped taking Vicodin, "[s]he had severe hot flashes." She "would become drenched" in sweat and was restless and unable to sleep.

During Wagner's testimony, the jury saw Jenny in person and photographs showing the scars Jenny has from the injuries she suffered because of the fire. Wagner explained that Jenny has keloid scarring on the right side of her face, under her chin, and along her jawline. Significant scarring also extends from her right shoulder all the way down her arm. And she has large scars across her abdomen. The "donor sites," where the strips of skin were removed from her thighs for grafting over other areas, also have extensive scarring.

According to Wagner, Jenny "will always" have "problems at the sites of the skin grafts." She must have moisturizing cream applied to those areas a few times every day because if the skin there "becomes dry, it will crack." And if Jenny becomes too hot, her thighs redden and become "sore, like a sunburn."

Since the fire, Jenny has not slept in a bed. Wagner believes that Jenny associates the bed with being in pain. If she is placed in a bed, she will not fall asleep. Instead, she sleeps in a recliner. Because pressure on the scar tissue by Jenny's right ear can be painful, Wagner has "to be very careful" to avoid putting pressure on that ear. Wagner places blankets underneath Jenny's right ear "to cushion it and to help keep her head more in alignment when she sleeps."

And since the fire, certain sounds, like sirens, will "startle [Jenny] excessively" and cause her to have muscle spasms. And on occasion, Wagner has heard Jenny ask, "Is Tanya crying?"

The trial court admitted into evidence copies of medical records documenting Jenny's treatment after the fire. They show that Jenny's lungs were injured from smoke inhalation, and she had "second[-] and third[-]degree burns" to her face, "chest, abdomen, and hands," covering twenty percent of her "total body surface area." She endured debridement, among other treatment procedures, and she underwent "surgery for skin grafts on her chest, abdomen, and hands." Risks and hazards associated with these procedures included "bleeding, pain," and "inflammation." The hospital staff could not assess Jenny's pain using the pain scale because she was "nonverbal."

Udemezue testified that she began working for Four J's in 2007. Her training included watching a "CD" and working with another staff member for two days

8

before being left to work alone at the facility. Four J's did not give Udemezue keys to any of the doors at the facility. Instead, a Four J's van driver would routinely drive her to the facility, and he would unlock the front door to let her inside. The sliding-glass door in the back of the facility was the only other outside door. But the sliding-glass door had a deadbolt lock that required a key to open it from the inside, and Udemezue did not have that key. Udemezue noted that the garage door of the facility did not properly function and would fall down if someone tried to use it. On trash pick-up days, staff members had to carry the trash from the garage, through the living room, and out the front door to get it to the curb.

Udemezue explained that when she began working at the facility, there were three residents: Jenny, Tanya, and Arzola. Later, a fourth resident, Campbell, moved in. Udemezue routinely supervised the four residents on her own. She had to "do virtually everything" for Jenny, who needed "total care." She and Jenny had a good relationship, and Jenny used to sing for Udemezue. Tanya also needed "total care," including assistance with bathing and brushing her teeth. Although Tanya could feed herself, she had to be prompted to complete basic tasks. Tanya was also "fond of hitting herself," and she would "hurt herself most of the time" if her hands were not kept separated. And Arzola, according to Udemezue, was "something else"; she was aggressive and "acted up all the time." Arzola often would damage

9

property and run away from the facility. Udemezue was "very scared" of Arzola. Campbell was also aggressive and difficult for Udemezue to manage.

On the day of the fire, Udemezue was working in Jenny's room when Arzola came in and tried to help her care for Jenny. Concerned about how Arzola was handling Jenny, Udemezue directed her to return to her bedroom. Arzola became angry but complied. A little later, Udemezue heard a "big bang." She went to Arzola's bedroom and saw that Arzola had broken a window. Udemezue telephoned a case manager to report Arzola's conduct, but she was unable to reach him. She also telephoned a nurse, who told her how to treat the cuts that Arzola had sustained in breaking the window. While Udemezue was treating Arzola's cuts, Arzola calmed down and apologized. As they were talking, Udemezue heard sirens and looked outside. She mentioned to Arzola that it appeared that a house at the end of the road was on fire.

Later, while Udemezue was washing clothes, she heard another "big bang." Thinking that something had occurred outside, she rushed out the front door to investigate. Once outside, she looked through Arzola's bedroom window, which was next to the front door, and realized that Arzola's room was on fire. Udemezue rushed back inside, pulled Campbell from her bedroom, and led her outside. Udemezue then went back inside the facility toward Jenny's and Tanya's bedrooms. But she realized that the fire was very close to the front door and she did not have a

10

key to the back door. She also knew that the garage door did not function. With access to only one door to the outside, Udemezue knew that "[i]f the fire g[ot] to that front door, that's it." They were "finished." Udemezue panicked. She yelled to Arzola and together they ran from the house. Udemezue telephoned for emergency assistance and shouted for help from neighbors, and then she "passed out." When she awakened, she was inside an ambulance.

Udemezue testified that she had panicked during the fire because she had only "one exit." And she "would have tried [her] best if [she had] had another door in that house." She also noted that she was alone, and she believed there would have been a better outcome had she had help from at least one other staff member.

According to Udemezue, Four J's provided her with fire-emergency training on two occasions through drills, but she was only trained to exit through the front door. Neither drill covered how to use a fire extinguisher or how to evacuate Jenny by wrapping her in a blanket and carrying her out of the facility.

Chiaka Irondi testified that from 2006 to February 2008, she worked for Four J's at the facility. Four J's did not provide Irondi with any fire-emergency training, but it required her to sign a statement that she had received such training. Irondi noted that the back door of the facility could not be opened without a key. That key, at some point before Irondi left, had been lost. She had reported its loss to Four J's.

11

The facility's garage door was also inoperative: it had to be held up to allow a person to pass underneath it if the person needed to enter or exit through the garage.

Kevin Kern, the Director of Residential Services for The Center in Houston, a social service agency that provides residential vocational services for persons with intellectual and developmental disabilities, testified as an expert about the standard of care applicable to facilities that provide residential services to persons with intellectual and developmental disabilities. Before testifying, Kern reviewed Four J's evacuation plans, Udemezue's deposition, the Houston Fire Department ("HFD") arson report, and documents about the other residents at the facility. Based on his review, he concluded that the applicable standard of care required that a residential care provider prohibit a resident with Arzola's history of physical and verbal aggression and self-injurious behavior any access to an incendiary device, such as a cigarette lighter. A residential care provider also must provide adequate supervision and room inspections by staff members. Kern explained that persons like Arzola are unable to "realize the consequences of their actions at the time that they are upset." Based on the individual needs of the residents at the facility, the applicable standard of care required that "the house most definitely needed to be double staffed." Kern noted that one of Four J's residents required total care and several of them had behavioral issues or concerns. For instance, he explained, it "would be impossible

12

to be bathing a [resident] in the bathroom when you may have another [resident who is] trying to leave the home or hav[ing] a physical altercation with another resident."

Kern also explained that the applicable standard of care for a four-bedroom residential care facility, such as here, required that it have an overhead sprinkler system, unless each of the residents could evacuate within three minutes, which is a "prompt evacuation score." And because fire-safety training must "be consistent across various shifts and different times of the day and night," such a facility must perform "third shift [fire] drill[s]." The standard of care also dictated that facility staff members be trained in the use of a fire extinguisher. Kern, based on his review of the HFD photographs, noted that although Udemezue was inside the facility during the early stages of the fire, she did not use the facility's fire extinguisher.

As for accessibility of exits in case of a fire, Kern stated that they "should be clear of obstacles." He stated that a door with a deadbolt lock that requires key access would meet the standard of care in a residential group home only "if all residents in the home had access to the key and that they could mentally and physically be able to open up the door with the key." Jenny could have "never met that criteria." And it was apparent that a key to the deadbolt was unavailable, even to the staff members. Kern concluded that Four J's had breached the standard of care in each of the areas that he had outlined.

13

Rick Overholt, the general manager of Omni Fire and Security Systems, LP ("Omni"), testified that he had installed a fire alarm at the facility. But the alarm that he installed was a local alarm that was not designed to automatically notify HFD in the event of a fire.

Dr. Karen Gollaher, a licensed psychologist practicing in Houston, testified that in March 2009, she performed a court-ordered evaluation of Arzola's competency to stand trial for the offense of arson in a separate criminal proceeding. She found Arzola incompetent to stand trial. Gollaher explained that Arzola experienced auditory hallucinations, had tremendous difficulty answering questions and understanding terms, and did not understand that a death had resulted from the fire.

Uduma testified that she is the president, chief executive officer, and sole shareholder of Four J's. She is also the sole owner of the facility, which she leases to Four J's. Before leasing the facility to Four J's, Uduma had a wheelchair ramp installed and the windows replaced with double hung windows. She had doorways and bathrooms widened to accommodate wheelchair users and had hollow interior doors replaced with solid core doors.

Uduma also testified that she contracted with Omni to install the fire alarm system in the facility. The contract itself identifies Four J's as the customer. The fire alarm system that Omni installed had a "local alarm only" and did not

automatically notify the HFD if a fire occurred. Omni does not install overhead sprinkler systems, and Uduma did not have overhead sprinklers installed in the facility.

Uduma stated that, as Program Director for Four J's, she makes "sure that the employees are trained, . . . that the agency complies with all the rules and regulations, which is called Community based Standard by" what was then known as the "Texas Department . . . of Mental Health and Mental Retardation ["TDMHMR"]." She added that another of her job responsibilities was to "make sure that when the State comes out to do an audit, that [Four J's] ha[s] every document to present to [the State], because [Four J's] ha[s] [an] audit once a year that the State come[s] and review[s] the whole program" by "go[ing] to the houses to make sure the houses . . . meet the health and safety of the [residents]," review[ing] [Four J's] documents," and "interview[ing] employees." And Uduma explained that she is personally involved in training the staff members because "if the staff [members] . . . d[o] not answer questions . . . relating to every [resident]," Four J's can be "cited, which could lead to termination of [the] contract." Uduma "invite[] the Adult Protective Services to come and train the staff [members] . . . once a year . . . on how to prevent abuse and negligence, to make them aware [of] what is considered physical abuse, verbal abuse, neglect and exploitation."

Uduma confirmed that she visited the facility "on many occasions." Omni would perform annual fire alarm system inspections, which Uduma attended. Before an inspection or "[w]hen there was something major with the alarm system or repairs," Omni would call Uduma and ask her to send a supervisor to let them into the facility.

Uduma would also accompany the fire marshal on annual inspections. She confirmed that the back door of the facility was locked with a deadbolt that required a key to open it. During fire inspections, Uduma would "open the drawer" to retrieve the back door key and open the back door.

At the time of the fire, there were four clients residing at the facility and only one staff member on duty. Uduma acknowledged that Four J's staff members were "never supposed to leave" residents unattended. And she admitted that the back door of the house had a deadbolt lock that required a key to open it from the inside, and staff members seldom had the key to the back door.

Before the fire, Uduma and Four J's knew that Arzola had been diagnosed with bipolar disorder, had tried to commit suicide, and had a history of violence toward staff members. And Uduma was familiar with Arzola's psychological evaluation and "Annual Individual Service Plan," the most recent of which Four J's had completed the month before the fire. Arzola, who was then twenty-five years old, had, as a child, been emotionally, physically, and sexually abused, including

16

being compelled into prostitution by her biological parents. After their parental rights had been terminated, Arzola's parents facilitated her unauthorized departure from Richmond State School and took her to the Dallas area, where she "became infected with herpes as a result of . . . sexual activity between her and her father." Arzola also had a history of alcohol and narcotics abuse, many placements in residential treatment centers, and "multiple contacts" with the Dallas Juvenile Justice Department for running away, evading arrest, prostitution, probation violations, and assault. And Arzola had a long history of behavioral issues, including breaking windows and light fixtures, trying to leap from moving vehicles, swallowing objects, wrapping ligatures around her throat, biting herself and others, and "headbanging," choking, stabbing, and bludgeoning others. Based on a "complete diagnostic evaluation," Four J's concluded that Arzola was functioning "within the mild range" of intellectual disability and her behavior was "non-compliant most of the time." Although she had not been adjudicated incompetent by a court at the time of the fire and was acting as her own legal guardian, her behavioral problems were "severe" and required multiple psychotropic medications to manage. Her behavioral problems were "typically occasioned by staff [members] making requests of her, delaying or denying her tangibles or services," or "dividing their time" between Arzola and others. Because Four J's

17

knew that Arzola's aggression might result in injury to herself and others, it directed that staff members "[k]eep all sharps, medications, and poisons" in locked storage.

Uduma also testified that although Four J's allowed Arzola to smoke cigarettes, it did not allow her to keep a cigarette lighter. Uduma did not know how Arzola had obtained the cigarette lighter that she had used to start the fire. But she conceded that Four J's never searched Arzola's bedroom for contraband because the room "belong[ed] to her." Uduma contended that Arzola was solely responsible for the injuries that had resulted from the fire because Arzola was "a competent adult" who was only mildly intellectually disabled, she had set the fire, and law-enforcement authorities had arrested her for arson. According to Uduma, if Udemezue had followed her fire-emergency training, she would have been able to timely evacuate all the residents without injury. Uduma stated that a key to the locked back door was kept in a kitchen drawer at the facility.

Ngozi Obichuku, a care coordinator at Four J's, testified that Jenny was the only client at the facility who would have needed physical assistance to evacuate. On May 13 and June 6, 2008, Obichuku had trained Udemezue about Jenny's individual evacuation plan. According to Obichuku, Udemezue simply did not follow her fire-emergency training during the fire. As for Arzola's access to a cigarette lighter, Obichuku explained that the residents of the facility were allowed to take "smoking breaks," during which the staff members "issue[d] out the lighters."

18

And the staff members were responsible for collecting the cigarette lighters "after the [residents] [we]re done."

Question One of the jury charge asked the jury: "Did the negligence, if any, of [Four J's, Uduma, and Arzola] proximately cause the injuries in question?" As to both Four J's and Uduma, the jury answered, "Yes." As to Arzola, the jury answered, "No." In response to Question Two of the jury charge, the jury apportioned the responsibility of Four J's at sixty percent and Uduma at forty percent. And in response to Question Three of the jury charge, the jury awarded Wagner damages as follows:

Physical pain and mental anguish sustained in the past: $4,000,000.

Physical pain and mental anguish that, in reasonable
probability, Jenny will sustain in the future: $1,500,000.

Disfigurement sustained in the past: $1,500,000.

Disfigurement that, in reasonable probability, Jenny
will sustain in the future: $1,000,000.

Reasonable expenses of necessary medical care
actually paid or incurred by or on behalf of Jenny: $76,400.

The trial court entered judgment on the verdict, and Four J's and Uduma moved for a new trial. The trial court granted the motion, and Wagner petitioned

19

this Court for mandamus relief. We conditionally granted relief,[2] and the trial court set aside its new-trial order and reinstated its judgment.

## Legal Sufficiency of Evidence of Uduma's Negligence

In their first issue, Four J's and Uduma argue that there is legally insufficient evidence to support the jury finding's that Uduma is personally liable for negligence because no evidence shows that Uduma was negligent as lessor of the facility's premises or as an owner, employee, and agent of Four J's.

When a party attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the finding. *Exxon Corp. v. Emerald Oil & Gas, Co.*, 348 S.W.3d 194, 215 (Tex. 2011). We will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

In a legal sufficiency review, we consider the evidence in a light most favorable to the jury's finding, crediting favorable evidence if reasonable jurors

---

[2]     *In re Wagner*, 560 S.W.3d 309, 320–24 (Tex. App.—Houston [1st Dist.] 2017, orig. proceeding [mand. denied]).

could, and disregarding contrary evidence unless reasonable jurors could not. *Id.* at 827; *see also Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003) (in reviewing "no evidence" point, court views evidence in light that tends to support finding of disputed fact and disregards all evidence and inferences to contrary); *Republic Petroleum, LLC v. Dynamic Offshore Res. NS LLC*, 474 S.W.3d 424, 433 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See City of Keller*, 168 S.W.3d at 819; *Republic Petroleum*, 474 S.W.3d at 433.

Lessors generally owe no duty to tenants or their invitees for dangerous conditions on leased premises. *Johnson Cty. Sheriff's Posse, Inc. v. Endsley*, 926 S.W.2d 284, 285 (Tex. 1996). This rule stems from the notion that a lessor relinquishes possession of the premises to the lessee. *Id.* at 285; *Blancett v. Lagniappe Ventures, Inc.*, 177 S.W.3d 584, 590 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *see* RESTATEMENT (SECOND) OF TORTS § 356 cmt. a. (AM. LAW INST. 1965).

Texas courts recognize exceptions to this general no-duty rule. For example, a lessor who agrees to repair the leased property owes a duty to exercise ordinary care in making the repair, and a lessor who makes repairs may be liable for injuries resulting from the lessor's negligence in making those repairs. *Blancett*, 177 S.W.3d at 590. A lessor may also be liable if she concealed defects on the leased premises.

21

*Id.* And, at issue here, a lessor may be liable if an injury is caused by a defect on a portion of the premises that remained under the lessor's control. *Id.*; *see* RESTATEMENT (SECOND) OF TORTS §§ 360, 361 (AM. LAW INST. 1965).

Question One of the jury charge about negligence contained the following instruction:

> With respect to the condition of the premises, . . . Uduma was negligent if—
>
> 1) the condition posed an unreasonable risk of harm, and
>
> 2) . . . Uduma knew or reasonably should have known of the danger, and
>
> 3) . . . Uduma failed to exercise ordinary care to protect Jenny . . . from the danger, by both failing to adequately warn the [g]uardian[] of Jenny . . . of the condition and [by] failing to make that condition reasonably safe.

No jury charge question was submitted on the element of control, and Four J's and Uduma did not object to the omission. *See Blancett*, 177 S.W.3d at 590 (lessor may be liable if injury is caused by defect on portion of premises that remained under lessor's control). As a result, if there is legally sufficient evidence to support a finding of control, it is "deemed found by the court in such manner as to support the judgment." TEX. R. CIV. P. 279; *see also Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228–29 (Tex. 2011).

Uduma testified both in her capacity as the corporate representative for Four J's and in her individual capacity as the owner of the facility premises. Before

22

leasing the facility to Four J's, Uduma had a wheelchair ramp installed and the windows replaced with double-hung windows. She had doorways and bathrooms widened to accommodate wheelchair users and had hollow interior doors replaced with solid-core doors.

Uduma also testified that she contracted with Omni to install the fire alarm system in the facility. The contract itself identifies Four J's as the customer. The fire alarm system that Omni installed had a "local alarm only" and did not automatically notify the HFD if a fire occurred. Omni does not install overhead sprinkler systems, and Uduma did not have overhead sprinklers installed in the facility.

Uduma confirmed that she visited the facility "on many occasions." Omni would perform annual fire alarm system inspections, which Uduma attended. Before an inspection or "[w]hen there was something major with the alarm system or repairs," Omni would call Uduma and ask her to send a supervisor to let them into the facility.

Uduma would also accompany the fire marshal on annual inspections. She confirmed that the back door of the facility was locked with a deadbolt that required a key to open it. During fire inspections, Uduma would "open the drawer" to retrieve the back door key and open the back door.

Kern testified that the applicable standard of care for a four-bedroom residential care facility required that it have an overhead sprinkler system unless each of the residents could evacuate herself within three minutes. Kern also stated that exits in a residential group home "should be clear of obstacles" to allow for quick escape in the event of a fire. And a door with a deadbolt lock that requires key access would meet the standard of care in a residential group home only "if all residents in the home had access to the key and that they [were] mentally and physically" able "to open up the door with the key," which was not the case in the facility.

Four J's and Uduma refer this Court to *Osti v. Saylors*, 991 S.W.2d 322 (Tex. App.—Houston [1st Dist.] 1999, pet. denied), which involved a suit for the wrongful death of tenants who died in apartment fire. 991 S.W.2d at 324. There, the evidence showed that the landlord "was in control of structural changes and did not expect his tenants to build a safe fire escape," and the court determined that the landlord "owed his tenants a duty under the common law to exercise reasonable care in discovering the risk of having inadequate means of egress and in making a safe second means of egress." *Id.* at 326 (citing RESTATEMENT (SECOND) OF TORTS § 361 cmt. a (AM. LAW INST. 1965)). Four J's and Uduma try to distinguish *Osti*, asserting that it "involves heightened obligations" for landlords and the landlord in *Osti* had control over structural components of the building, including those structural components that

would provide for the safe exit from a building during a fire. *Id.* at 327. But here, like *Osti*, the record shows that Uduma exercised control over safety issues in the facility. As premises owner, she made structural changes to the house so that it could be leased as a residential group home facility and admittedly did not have an overhead sprinkler system installed. And Uduma would enter the facility regularly, including for the purpose of fire safety inspections, and she was aware of the deadbolt lock on the back door that required a key. Given that she was testifying both as Four J's corporate representative and as premises owner, her testimony about improvements to the property she made as premises owner and her testimony about her involvement in fire safety inspections, in which her role was not clear, reasonable jurors could infer that Uduma was acting, at least in part, as premises owner by participating in fire inspections. And the jury could credit Kern's testimony that the facility did not meet the standard of care because it lacked an overhead sprinkler system and had a locked back door, and find Uduma responsible as premises owner, because she made other modifications to the home so that it could serve as a residential group home facility.

Viewing the evidence in a light most favorable to the jury's finding, some evidence supports the jury's finding that, as premises owner, Uduma negligently exercised control over the fire safety condition of the facility, including the locked back door. Thus, we hold that legally sufficient evidence supports the jury's finding

that Uduma was negligent as lessor of the facility's premises. As a result, we need not consider whether the evidence supports a finding of negligence against Uduma as an owner, employee, and agent of Four J's. *See* TEX. R. APP. P. 47.1.

We overrule Four J's and Uduma's first issue.

**Factual Sufficiency of Evidence of Non-Economic Damages**

In their second issue, Four J's and Uduma argue that the evidence is factually insufficient to support the jury's damages awards for past and future disfigurement and past and future physical pain and mental anguish because the awards "run[] against the great weight and preponderance of the evidence and [are] so excessive that [they are] unjust." As a result, Four J's and Uduma assert that the non-economic damages awarded here are excessive and require a remittitur. *See Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986) (challenges to excessiveness of damages awards are factual-sufficiency challenges).

When a party attacks the factual sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Estrada v. Cheshire*, 470 S.W.3d 109, 120 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). In conducting a factual-sufficiency review, we examine, consider, and weigh all evidence that supports or contradicts the jury's determination. *See Dow*

26

*Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989)  As in a legal-sufficiency review, we recognize the jury as the sole judge of the credibility of the witnesses and the weight to be given to their testimony.  *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

"When someone suffers personal injuries, the damages fall within two broad categories—economic and non-economic damages."  *Id.* at 763.  Non-economic damages, which are at issue here, provide compensation for an injured party's pain, suffering, mental anguish, disfigurement, and physical impairment.  *See id.*  Because each case is unique and measured by its own facts, the jury has wide latitude in determining the appropriate amount to award in a personal injury case.  *Primoris Energy Servs. Corp. v. Myers*, 569 S.W.3d 745, 760 (Tex. App.—Houston [1st Dist.] 2018, no pet.).  "Once the existence of some pain, mental anguish and disfigurement has been established, there is no objective way to measure the adequacy of the amount awarded as compensation, which is generally left to the discretion of the [jury]."  *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (internal quotations omitted).

The jury awarded Wagner $1.5 million for past disfigurement and $1 million for future disfigurement.  Relying on our decision in *Houston Lighting Power Co. v. Reed*, 365 S.W.2d 26 (Tex. Civ. App.—Houston 1963, writ ref'd n.r.e.), Four J's

and Uduma argue that the jury's disfigurement award is excessive and unjust because, due to Jenny's "diminished mental capacity and diminished ability to communicate," there is "no evidence that [she] suffered any embarrassment or that the contemplation of scars caused by her skin grafts and scarring has caused any mental suffering."

Damages are measured by the question and instruction given in the trial court's jury charge. *Equistar Chems. L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007); *Primoris Energy Servs.*, 569 S.W.3d at 758. Because the jury charge did not define "disfigurement," we measure the sufficiency of the evidence against the commonly understood meaning of the word. *Primoris Energy Servs.*, 569 S.W.3d at 758. Disfigurement is "that which impairs the appearance of a person, or that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Doctor v. Pardue*, 186 S.W.3d 4, 18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). As defined, disfigurement does not have any mental or emotional element.

This Court's decision in *Reed*, which predates *Doctor*, does not suggest a more expansive definition of disfigurement. There, the defendant had objected to an instruction in the jury charge informing the jury on the damages issue, "to consider 'such humiliation and embarrassment[] which [the plaintiff] will suffer in [the] future.'" *Reed*, 365 S.W.2d at 29. The defendant asserted that "humiliation and

28

embarrassment" is "not a proper item of damages, and is not the type of element of damages that a jury is supposed to consider." *Id.* (internal quotations omitted.) On appeal, we considered "whether embarrassment and humiliation may properly be considered by the jury as elements of damage for personal injuries resulting in disfigurement, i.e., the loss of an eye, and whether this method of submission permits double recovery." *Id.* at 30.

In doing so, this Court observed that mental suffering, disfigurement, and humiliation are separate "items of damage" that may be submitted where appropriate. *Id.* As for disfigurement, we remarked that it could be a properly submitted element of damage "aside from any effect it might have on earning capacity," noting that its submission "may be justified on the theory that suffering is induced in the mind of the injured party by contemplation of his changed physical condition." *Id.* And we reasoned that "[d]amages are allowed for disfigurement, humiliation, embarrassment and fright because they cause mental suffering." *Id.*

Whatever the origins of disfigurement as an element of damages, the Court's discussion in *Reed* makes clear that disfigurement can be submitted as an issue separate from the issue of humiliation or embarrassment. *See id.* Here, Question Three of the jury charge about disfigurement did not ask the jury to consider any mental or emotional state in deciding how much to award Wagner, nor did the charge

29

define disfigurement in a way that required consideration of Jenny's mental or emotional state.

Four J's and Uduma next argue that no evidence supports the jury's damages award for future disfigurement because there is no evidence of Jenny's life expectancy. But Four J's and Uduma cite no authority requiring proof of life expectancy before damages for future disfigurement can be awarded. "The matter of future disfigurement is necessarily speculative and there is no mathematical yard stick by which one can measure damages for it." *Tri-State Motor Transit Co. v. Nicar*, 765 S.W.2d 486, 494 (Tex. App.—Houston [14th Dist.] 1989, no writ); *see also Pipgras v. Hart*, 832 S.W.2d 360, 365 (Tex. App.—Fort Worth 1992, writ denied) (observing "award of future damages in a personal injury case is always speculative" and "[l]ife expectancy, medical advances, and the future cost of products, services and money are not matters of certainty").

Texas courts have upheld awards for other elements of future damages without requiring proof of life expectancy. *See, e.g.*, *Wal-Mart Stores, Inc. v. Ard*, 991 S.W.2d 518, 523 (Tex. App.—Beaumont 1999, pet. denied) ("Proof of life expectancy is not required to recover lost future earnings, because the jury may reach its own conclusion as to life expectancy based upon evidence of the injured party's age, health and physical condition prior to the injury, and the permanence of the injury."); *Paragon Hotel Corp. v. Ramirez*, 783 S.W.2d 654, 661 (Tex. App.—El

30

Paso 1989, writ denied) (same); *see also Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835, 863 (Tex. App.—Fort Worth 2003, pet. denied) (proving life expectancy in medical malpractice suit to reasonable medical probability would be impossible because "life expectancy, by its very nature, is uncertain"); *Turner v. Duggin*, 532 S.W.3d 473, 484–86 (Tex. App.—Texarkana 2017, no pet.) (upholding, as factually sufficient, jury award of damages for future physical pain and mental anguish where only counsel's argument, not evidence, addressed plaintiff's life expectancy).

The undisputed evidence shows that Jenny has extensive scarring, both from the severe burns she suffered in the fire and from the surgical removal of skin used for grafts to heal the most severely burned areas. Her right ear and the right side of her face have visible scarring, and she has some keloid scarring. The jury saw several photographs of Jenny's scars and saw Jenny in person, and Wagner pointed out the various locations on Jenny's body where scars appear. The scars are permanent. Wagner testified that the skin graft "donor sites" on Jenny's thighs require daily treatment with moisturizing cream to prevent the skin from becoming dry and cracked. We hold that the evidence is factually sufficient to support the jury's damages awards for past and future disfigurement.

Four J's and Uduma next assert that the evidence is factually insufficient to support the jury's damages awards of $4 million for past physical pain and mental

31

anguish and $1.5 million for future physical pain and mental anguish. They acknowledge that the evidence showed that Jenny, who was only able to communicate in very rudimentary ways, was "very uncomfortable and in pain in some way" because she could be heard grinding her teeth when the respiratory and feeding tubes were removed at the hospital, and that she ground her teeth in reaction to the pain she experienced. Together with this evidence, there is ample circumstantial evidence of Jenny's physical pain that the jurors, using common knowledge and their own experience, could consider in determining the amount of damages to award. Second- and third-degree burns covered twenty percent of Jenny's total body surface area, and she underwent surgery to remove charred skin and replace it with skin grafts taken from her thighs. Jenny was prescribed narcotic pain medication, which she took for at least two months after the fire, then suffered the effects of withdrawal from that medication when she stopped taking it. Because of the sensitivity of the keloid scarring on Jenny's right ear, Wagner has to cushion Jenny's head with a blanket to take pressure off it while Jenny sleeps. Jenny will always have problems at the sites of the skin grafts, and the skin graft "donor sites" on her thighs remain sensitive to heat.

As to mental anguish, the jury could also reasonably find that Jenny has past and future mental anguish from the trauma she endured. Since the fire, Jenny does not fall asleep when placed in a bed, is "excessively" startled by sirens, and

occasionally calls out for Tanya, her housemate who died in the fire. We hold that the evidence is factually sufficient to support the jury's damages awards for past and future physical pain and mental anguish.

We overrule Four J's and Uduma's second issue.

## Damages Cap for Health Care Liability Claim

In its third issue, Four J's argues that the trial court erred in not applying the damages cap under Texas Civil Practice and Remedies Code section 74.301 because Wagner's claim constitutes a health care liability claim governed by the Texas Medical Liability Act ("TMLA").[3]

The TMLA defines a "[h]ealth care liability claim" as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (internal quotations omitted); *see also Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 501 (Tex. 2015). Thus, we consider three basic elements in determining whether a plaintiff's claim constitutes a health care liability claim: (1) whether the defendant is a physician or health care provider; (2) whether the claim at issue concerns treatment, lack of

---

[3]   *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.001–.507.

treatment, or a departure from accepted standards of medical care, or health care, or safety, or professional or administrative services directly related to health care; and (3) whether the defendant's act or omission complained of proximately caused the injury to the plaintiff. *Rio Grande Valley Vein Clinic, P.A. v. Guerrero*, 431 S.W.3d 64, 65 (Tex. 2014); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(11)–(13).

In a suit involving a health care liability claim, the TMLA limits the amount of non-economic damages a plaintiff can recover against a defendant physician or health care provider, other than a health care institution, to "an amount not to exceed $250,000 for each [plaintiff], regardless of the number of defendant physicians or health care providers[,] other than a health care institution[,] against whom the claim is asserted or the number of separate causes of action on which the claim is based." TEX. CIV. PRAC. & REM. CODE ANN. § 74.301(a); *see also In re Cornejo*, No. 01-16-00299-CV, 2016 WL 5851901, at *4 n.2 (Tex. App.—Houston [1st Dist.] Oct. 6, 2016, orig. proceeding [mand. denied]) (mem. op.). The TMLA also limits the amount of non-economic damages a plaintiff can recover against a defendant health care institution, when a judgment is rendered against a single health care institution, "to an amount not to exceed $250,000 for each [plaintiff]." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.301(b); *see also In re Cornejo*, 2016 WL 5851901, at *4 n.2.

Generally, where Texas statutes provide for maximum compensatory damages and a defendant wants to rely on the cap, it is considered an affirmative

34

defense that must be pleaded and proved. *See* TEX. R. CIV. P. 94; *Gulf Coast Ctr. v. Curry*, No. 01-18-00665-CV, 2020 WL 5414983, *3 (Tex. App.—Houston [1st Dist.] Sept. 10, 2020, no pet.) (mem. op.) (entity failed to conclusively prove it was entitled to protection of damages cap under Texas Tort Claims Act as unit of local government, as required for deemed finding under Texas Rule of Civil Procedure 279); *River Oaks L-M v. Duarte*, 469 S.W.3d 213, 237 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (statutory cap on compensatory damages found in Texas Labor Code section 21.2585(a)(1) is affirmative defense that must be pleaded and proved); *see also Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896–97, 904–905 (Tex. 2000) (party's mistake in pleading wrong section number of statutory cap as affirmative defense did not preclude application of cap).

We have held in this case, and the parties agree, that the damages cap under Texas Civil Practice and Remedies Code section 74.301 is an affirmative defense.[4] *See Uduma v. Wagner*, No. 01-12-00796-CV, 2014 WL 4259886, *5 (Tex. App.—Houston [1st Dist.] Aug. 27, 2014, pet. denied) (mem. op.); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.301(b) ("In an action on a health care liability claim where final judgment is rendered against a single health care institution, the limit of civil liability for noneconomic damages inclusive of all persons and entities for which

---

[4] In its briefing, Four J's "acknowledges that the damages cap in [s]ection 74.301 is an affirmative defense that must be pled."

vicarious liability theories may apply, shall be limited to an amount not to exceed $250,000 for each [plaintiff]."). And the trial court granted Four J's motion for leave to amend its pleadings to assert that affirmative defense. *See Uduma*, 2014 WL 4259886, at *3 n.8.

Four J's asserts that the trial court should have decided that it was entitled to rely on the damages cap under Texas Civil Practice and Remedies Code section 74.301 as a matter of law.[5] But Four J's did not move for summary judgment on its affirmative defense before trial, and it did not ask for a directed verdict or a jury finding on its affirmative defense. As a result, Four J's is entitled to section 74.301's damages cap only if the evidence adduced at trial conclusively proves that Wagner's claim against Four J's constituted a health care liability claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.301(a), (b) (damages caps apply "[i]n an action on a health care liability claim"). In other words, the record must conclusively show that (1) Four J's was a health care provider, (2) Wagner's claim concerned treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety, or professional or administrative services directly related to health care, and (3) Four J's act or omission proximately caused Wagner's injury. *See Rio*

---

[5]    In portions of its briefing, Four J's asserts that the damages cap under Texas Civil Practice and Remedies Code section 74.301(a) applies to this case and in other portions of its briefing Four J's references the damages cap under section 74.301(b). In its answer, Four J's did not specify on which particular subsection it relies.

*Grande Valley Vein Clinic*, 431 S.W.3d at 65; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(11), (12)(A)(vii); TEX. R. CIV. P. 279 (party waives independent ground of recovery or defense by failing to seek finding unless evidence conclusively establishes claim or defense).

The parties dispute whether Four J's conclusively proved its status as a health care provider, specifically, whether Four J's was "duly licensed, certified, registered, or chartered" when the fire occurred. The TMLA defines a "health care provider" as "any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care," including, among other things "a health care institution." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(12). The statute, in turn, defines "health care institution" as including "an intermediate care facility for the mentally retarded or a home and community-based services waiver program for persons with mental retardation adopted in accordance with Section 1915(c) of the federal Social Security Act (42 U.S.C. Section 1396n), as amended." *Id.* § 74.001(a)(11)(I). An "intermediate care facility for the mentally retarded" is "a licensed public or private institution to which Chapter 252, Health and Safety Code,[6] applies." *Id.* § 74.001(18).

---

6     *See* TEX. HEALTH & SAFETY CODE ANN. §§ 252.001–.208.

As evidence to show its status as a health care institution, Four J's relies on Uduma's testimony that, as Program Director for Four J's, she makes "sure that the employees are trained, . . . that the agency complies with all the rules and regulations, which is called Community-based Standard by" what was then known as the [TDMHMR]." She added that another of her job responsibilities was to "make sure that when the State comes out to do an audit, that [Four J's] ha[s] every document to present to [the State], because [Four J's] ha[s] [an] audit once a year that the State come[s] and review[s] the whole program" by "go[ing] to the houses to make sure the houses . . . meet the health and safety of the [residents]," review[ing] [Four J's] documents," and "interview[ing] employees." And Uduma explained that she is personally involved in training the staff members because "if the staff [members] . . . d[o] not answer questions . . . relating to every [resident]," Four J's can be "cited, which could lead to termination of [the] contract." Uduma "invite[] the Adult Protective Services to come and train the staff [members]. . . once a year . . . on how to prevent abuse and negligence, to make them aware [of] what is considered physical abuse, verbal abuse, neglect and exploitation."

Four J's also points to evidence that the Department of Aging and Disability audits Four J's, reviewing fire drill records "for every house." Four J's is required to keep a letter in its files telling the fire inspector that fire retardant has been applied to the cabinets, beds, curtains, and other surfaces in the facility so that "when the

State comes to do the audit," it can verify that Four J's "pass[es] the . . . fire marshal inspection." Controverting this evidence is a "[b]rief [s]ervice [n]ote" in Jenny's medical records from Cindy Walker, Memorial Hermann Hospital's clinical social worker, noting a contact with the Texas Department of Aging and Disability, which informed Walker that the residential group home run by the Four J's where Jenny lived "[was] not licensed."

Because of the dispute about whether Four J's was a "duly licensed, certified, registered, or chartered" heath care provider when the fire occurred, Four J's cannot conclusively prove that Wagner's claim constituted a health care liability claim and that Texas Civil Practice and Remedies Code section 74.301's damages cap applies here. Thus, we hold that the trial court did not err in not applying section 74.301's damages cap to this case.

We overrule Four J's third issue.

## Conclusion

We affirm the judgment of the trial court.

Julie Countiss
Justice

Panel consists of Justices Hightower, Landau, and Countiss.

39