**Opinion filed January 22, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00064-CV

_____

## MEMORIAL PARK
## MEDICAL CENTER, INC., Appellant

## V.

## BOB THORNHILL TRUCKING; TIM THORNHILL; AND
## UNITED SUPERMARKETS, LLC, Appellees

**On Appeal from the 35th District Court**
**Brown County, Texas**
**Trial Court Cause No. CV1502056**

## M E M O R A N D U M   O P I N I O N

This case concerns allegations of wrongful dumping of construction debris on a property following the demolition of a nearby commercial structure. Appellant, Memorial Park Medical Center, Inc. (Memorial), appeals a take-nothing judgment following a jury trial on its claims against Appellees, Bob Thornhill Trucking (BTT),

Tim Thornhill, and United Supermarkets, LLC (United) for alleged wrongful dumping. In two issues, Memorial argues that: (1) the trial court abused its discretion in denying Memorial a hearing on its motion for new trial due to evidence of juror misconduct; and (2) the jury's findings are not supported by factually sufficient evidence.[1] We affirm.

## I. *Factual and Procedural History*

Memorial sued BTT, Tim Thornhill, and United for damages related to the alleged illegal dumping of demolition waste on Memorial's twenty-six-acre tract of land in Brownwood (Memorial property).[2] Memorial's claims for trespass and for negligent hiring and supervision proceeded to a jury trial.

At trial, the evidence established that United was preparing to build a grocery store on a site occupied by the former Holley Chevrolet Dealership in Brownwood. United solicited bids to sell the existing structures on the site and required any selected purchaser to remove all improvements "down to the slab and remove all of the building[s] from the property." United accepted Tim's bid, and the parties entered into a contract whereby Tim would pay $17,000 for the structures that he would then remove at his expense. Tim, who is a diesel mechanic, had never entered into a demolition contract or "bid a demolition job" before. Memorial did not investigate whether Tim could perform the demolition work.

Tim paid Danny Forbess $25,000 plus the material from one of the structures to disassemble the improvements on the site. Tim had his driver transport the materials to his son's property, then he put them on his own property to build a shop and truck wash. Tim's father, Bob, who owned BTT, hauled off the remaining

---

[1]Only United has filed an Appellee's brief.

[2]Memorial also sued Danny Forbess, Aldi (Texas), LLC, Deerfield Construction Co. Inc., and Tactical Demolition, LLC. The claims against these defendants were resolved before trial, and they are not parties to this appeal.

construction debris—about twenty-three truck loads—as a favor to his son. BTT then dumped the debris at the Memorial property because Bob believed the owners wanted the waste as fill to level the property. Bob did not speak to anyone with United regarding discarding this waste on their property.

Bill and Sloan Ruth, husband and wife, own Memorial and acquired the subject property in 2002. According to Sloan, they only allowed the dumping of clean fill (consisting of asphalt, crushed granite, road base, gravel, dirt, and sand) so that the property would be suitable for development. John Torres, Memorial's groundskeeper, noticed a BTT truck dumping construction material at the property in June and July of 2014, and he notified Bill and Sloan. Torres testified at trial that Memorial did not allow dumping on the site; however, three companies (not including BTT) were permitted to dispose of clean fill there. Bill met Torres at the property, and they proceeded to the Holley Chevrolet site where they observed ongoing demolition. To Torres's knowledge, the dumped material was never removed from the Memorial property. Torres testified that once they learned of the dumping, they secured the back gate with a lock with Jay Mills and Atmos having permission to access the property. However, two to three weeks later, BTT trucks arrived with more construction material, circumventing the back gate. The debris included cinder blocks, toilets, PVC pipe, insulation, and sheetrock.

There was conflicting testimony regarding whether Memorial accepted only clean fill at the property. Bob testified that, in a previous conversation with Bill, he was told that Memorial accepted any fill "except trash, tree limbs, or tires." Tim testified that Bob had been dumping material at the property for twenty years. In a July 2, 2014 letter addressed to BTT, Bob's company, Bill wrote that he did "not have a problem with [the Memorial property] being used" to dump the Holley Chevrolet material but said that the material could "be pushed and covered" and that Jay Mills "has a dozer on site to push the piles." Sloan testified that Memorial did

not allow unregulated dumping, but she also stated that Memorial never did any testing to see that the dumped materials were clean fill. Sloan assessed the value of the Memorial property between $1 and $4 per square foot, for a total valuation between $820,000 and $3 million. She said that the Ruths' plans for future development were prevented by the unclean fill dumped on the property.

Mark Pirkle, who performs excavation work, was asked by Bill to give him a quote to excavate twenty feet deep over one acre of land. Pirkle estimated it would cost $2,404,960, which covered excavation, removal, and disposal of all materials. When asked why he would have to excavate twenty feet deep over one acre, Pirkle replied, "That's what the owner asked for."

Kenneth Tramm, PhD, performed a historical review of dumping at the Memorial property, including looking at aerial maps. Dr. Tramm observed that material had been dumped on the property since 1983. After Memorial acquired the property, the dumping continued. Dr. Tramm dug five test pits, and he observed that the primary waste from Holley Chevrolet consisted of cinder blocks. He discovered varied waste, including wood fragments, trash bags, shag carpet, PVC pipe, rebar, clay pipe, plastic toys, and bedding, among other debris. Much of the material found in the test pits were inconsistent with the materials that would have come from the Holley Chevrolet site. Dr. Tramm explained that approximately 286 cubic yards of cinder block material were dumped from the Holley Chevrolet site and that this constitutes less than one percent of the amount that Pirkle was asked to remove from the property. He stated that cinder blocks are inert and can be rendered suitable fill to build on. He opined that it would cost $18,022.50 to remove the material that came from Holley Chevrolet. Based on his investigation, Dr. Tramm testified that dumping had been ongoing at the Memorial Property for at least twenty years.

At the conclusion of trial, the jury found as follows: (1) "the parties mutually intend[ed] that the dominant factor of the primary purpose of the Contract"[3] between United and Tim was the sale of the property improvements, "conditioned on removal of the improvement[s] from the Premises"; (2) neither Tim or BTT were acting as an employee of United; (3) United was "negligent in the hiring and/or supervision of Tim Thornhill that proximately caused injury to Memorial Park"; (4) Tim and BTT committed a trespass on Memorial's property, but United did not; (5) BTT's trespass was intentional; (6) Memorial was ninety-seven percent responsible for its own injury, while Tim, BTT, and United were each one percent responsible; (7) the "amount reasonable and necessary to repair, fix, or restore [the property] to the condition immediately preceding the [trespass]" was "$0"; (8) the sum of money that "would fairly and reasonably compensate Memorial Park for the property damage resulting from the trespass" was "$0"; and (9) Tim was not "unjustly enriched" by BTT's "trespass on Memorial Park's Property." The trial court signed a final take-nothing judgment pursuant to the jury's findings.

Memorial filed a motion for new trial, challenging the sufficiency of the evidence and asserting jury misconduct.[4] Memorial attached evidence in support of its contention that two jurors withheld information during voir dire. The motion for new trial was overruled by operation of law, and this appeal followed.

---

[3]As defined in the trial court's charge: "'Contract' means the written document between United and Tim Thornhill dated May 8, 2014, and is marked as Defendant's Exhibit No. 13'; "'United's Premises' mean the real property owned by United, formerly a car dealership, located at 300 East Commerce, Brownwood, TX 76801;" "'Intentional' means that Bob Thornhill acted with intent with respect to the nature of its conduct or to a result of its conduct when it was the conscious objective or desire to engage in the conduct or the result."

[4]Memorial asserted additional grounds that are not relevant to this appeal.

## II. *Juror Misconduct*

In its first issue, Memorial argues that the trial court abused its discretion by not holding a hearing on its motion for new trial. Specifically, Memorial argues that it presented sufficient evidence that two jurors withheld information during voir dire to warrant a hearing.

### A. *Standard of Review & Applicable Law*

Rule 327 provides in relevant part as follows:

> When the ground of a motion for new trial, supported by affidavit, is misconduct of the jury . . . or because of any communication made to the jury . . . the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the communication made . . . be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.

TEX. R. CIV. P. 327(a). Thus, "[i]t is reversible error for the trial court to refuse to hear testimony on a motion for new trial if 'affidavits are attached to the motion *showing material jury misconduct*.'" *Jefferson v. Helen Fuller and Assocs. Health, Inc.*, No. 01-11-00199-CV, 2012 WL 2357431, at *7 (Tex. App.—Houston [1st Dist.] June 21, 2012, pet. denied) (mem. op.) (emphasis added) (quoting *Roy Jones Lumber Co. v. Murphy*, 163 S.W.2d 644, 646 (Tex. 1942)); *see* TEX. R. CIV. P. 327(a).

The purpose of the affidavit requirement is to assure the trial court that the movant will be able to support the allegations in his motion by competent proof. *In re Zimmer, Inc.*, 451 S.W.3d 893, 901 (Tex. App.—Dallas 2014, no pet.). The motion and affidavit enable the trial court to "make an initial determination as to whether material misconduct occurred." *Elston v. Sherman Coca–Cola & Dr. Pepper Co.*, 596 S.W.2d 215, 217 (Tex. App.—Texarkana 1980, no writ) (citing *Whited v. Powell*, 285 S.W.2d 364 (Tex. 1956)). "Unless material misconduct is

6

shown by affidavit the [trial] court need not consider evidence on the motion." *Id.* (citing *Cortez v. Med. Protective Co. of Ft. Wayne*, 560 S.W.2d 132 (Tex. App.— Corpus Christi–Edinburg 1977, writ ref'd n.r.e.)).

"To warrant a new trial for jury misconduct, the movant must establish (1) that the misconduct occurred, (2) it was material, and (3) probably caused injury." *In re Whataburger Restaurants LP*, 429 S.W.3d 597, 598–99 (Tex. 2014) (orig. proceeding) (quoting *Golden Eagle Archery v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000)); *see* TEX. R. CIV. P. 327(a). The complaining party has the burden to prove all three elements. *In re Whataburger Restaurants*, 429 S.W.3d at 599. "Whether misconduct occurred and caused injury is a question of fact." *Id.*

B. *Analysis*

Memorial bases this issue on information allegedly withheld by jurors Celty Kearney and Joseph Ryan. During voir dire, when asked if she knew Bill Ruth, Kearney responded, "I know him. He's a friend of my cousin." She stated that this familiarity would not affect her ability to remain impartial. Kearney also disclosed that she previously worked for Tommy Adams, who was legal counsel for the Thornhill parties. Memorial presented the affidavit of Bill, where he testified that he knew Kearney and that he communicated with her multiple times about litigation matters, including the present case due to her employment with Adams.[5]

When the panel was asked if anyone knew Tim, Ryan did not respond. Ryan disclosed that he worked for Ryan Construction and that his uncle owned the company. Ryan did not respond when the panel was invited to disclose anything that might affect their impartiality. Memorial presented affidavit testimony establishing that Ryan Construction generally did business with the Thornhills and that Tim had conveyed property to Ryan Construction.

---

[5]Bill also stated that Kearney knew the Thornhills and Torres. Memorial does not complain on appeal about Kearney's failure to disclose her knowledge of these witnesses or parties during voir dire.

Memorial argues that Kearney's disclosures were incomplete and misleading because she did not reveal her interactions with Bill regarding the present lawsuit. It argues that Ryan failed to disclose his family's business dealings with the Thornhills. First, we note that Kearney disclosed her familiarity with Bill as well as her employment by Adams. She was not asked any questions that required her to disclose her interactions with Bill in any detail. Likewise, Ryan was not asked any questions that would require him to disclose any business dealings between Ryan Construction and the Thornhills. He was only asked whether he personally knew Tim, and there is no evidence that he responded to other questions untruthfully. Neither does Ryan's failure to respond to the general question regarding the ability to remain impartial constitute evidence that he withheld information during voir dire. *See Foote v. Texcel Expl., Inc.*, 640 S.W.3d 574, 587 (Tex. App.—Eastland 2022, no pet.) ("Catch-all questions do not meet the requirement of specificity."). These are certainly proper areas into which trial counsel for Memorial could have ventured by asking further questions of Kearney and Ryan. We conclude that Memorial's affidavits did not demonstrate material jury misconduct; therefore, the trial court did not abuse its discretion in failing to hold an evidentiary hearing on Memorial's motion for new trial. *See Ed. Caballero, S.A. DE C.V. v. Playboy Enters., Inc.*, 359 S.W.3d 318, 327–28 (Tex. App.—Corpus Christi–Edinburg 2012, pet. denied); *Jefferson*, 2012 WL 2357431, at *8, *10.

However, even if we were to decide that Memorial presented evidence of jury misconduct warranting a hearing, it has nevertheless failed to show that it probably suffered injury. *See Whataburger Rests.*, 429 S.W.3d at 599 n.1 ("Since we find no evidence that [the juror's] nondisclosure resulted in probabl[e] injury . . . we need not decide whether the nondisclosure was material."); *Foote*, 640 S.W.3d at 587. The jury's verdict was unanimous. In a civil trial, the jury's verdict need not be unanimous. TEX. R. CIV. P. 292(a). There is no evidence that alleged juror

misconduct affected the outcome because even if two other jurors had been selected and voted differently, the jury's verdict would still be ten to two. *See Foote*, 640 S.W.3d at 587. For the foregoing reasons, we overrule Memorial's first issue.

### III. *Factual Sufficiency*

In its second issue, Memorial argues that there is factually insufficient evidence supporting "[t]he jury's findings as to proportionate responsibility and zero damages."

### A. *Standard of Review & Applicable Law*

"When a party challenges the factual sufficiency of the evidence supporting a finding for which it did not have the burden of proof, we may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Burnett v. Rios*, 549 S.W.3d 214, 225 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998)). To successfully challenge the factual sufficiency of the evidence to support an adverse finding on an issue on which it bore the burden of proof at trial, the appellant must demonstrate that the finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We must consider and weigh all of the evidence and will set aside a verdict only if it is so contrary to the overwhelming weight of the evidence such that it is clearly wrong and unjust. *Dow Chem.*, 46 S.W.3d at 242; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). It is the factfinder's role to evaluate the credibility of the witnesses and reconcile any inconsistencies or conflicts in the evidence. *Golden Eagle*, 116 S.W.3d at 761. Generally, the factfinder may believe or disregard all or any part of the testimony of any witness. *Id.* at 774–75. We will not substitute our opinions on credibility for those of the factfinder. *See Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019).

Generally, "when an injury to real property is temporary, the owner is entitled to damages commensurate with the cost of restoring his property," however, "when an injury to the same property is permanent, the owner is entitled to damages commensurate with the loss in the fair market value to the property as a whole." *Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474, 476 (Tex. 2014); *see also Houston Unlimited, Inc. v. Mel Acres Ranch*, 443 S.W.3d 820, 825 (Tex. 2014) ("Generally, we have permitted landowners to recover *either* the lost value of their land if the injury to the land is permanent *or* the cost to repair or remediate the land if the injury is temporary.").

B. *Analysis*

1. *Proportionate Responsibility*

The proportionate-responsibility statute provides a framework for apportioning percentages of responsibility in the calculation of damages in any case in which more than one person, including the plaintiff, is alleged to have caused or contributed to cause the harm for which recovery of damages is sought. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003 (West 2020); *JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701, 702 (Tex. 2008). Consistent with the fundamental tenet of tort law that a person's liability arises from his own injury-causing conduct, the purpose of the statute is to hold each person "responsible [only] for [the person's] own conduct causing injury." *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 505 (Tex. 2010) (first alteration added) (quoting *F.F.P. Operating Partners, LP v. Duenez*, 237 S.W.3d 680, 690 (Tex. 2007)). Accordingly, the statute requires the factfinder to determine the percentage of responsibility of each claimant, defendant, settling person, and responsible third party who has been designated in accordance with the statute. *See* CIV. PRAC. & REM. § 33.003. As relevant here, the term "percentage of responsibility" is defined as:

10

[T]hat percentage, . . . attributed by the trier of fact to each claimant, [or] each defendant . . . with respect to causing or contributing to cause in any way, whether by negligent act or omission, . . . by other conduct or activity violative of the applicable legal standard, or by any combination of the foregoing, the . . . property damage . . . or other harm for which recovery of damages is sought.

*Id.* § 33.011(4). "[A] claimant may not recover damages if his percentage of responsibility is greater than 50 percent." *Id.* § 33.001; *see Gonzalez v. Sanchez*, 717 S.W.3d 516, 528 (Tex. App.—Eastland 2025, no pet.).

"[F]or purposes of the proportionate-responsibility statute, the Legislature both intends and requires fact-finders to consider relevant evidence of a plaintiff's pre-occurrence, injury-causing conduct." *Nabors Well Services, Ltd. v. Romero*, 456 S.W.3d 553, 563 (Tex. 2015). "[T]he jury is given wide latitude in determining the negligent parties' proportionate responsibility." *Primoris Energy Services Corp. v. Myers*, 569 S.W.3d 745, 762 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (quoting *Jackson v. Williams Bros. Constr. Co.*, 364 S.W.3d 317, 325 (Tex. App.—Houston [1st Dist.] 2011, pet. denied)). "Even if the evidence could support a different percentage allocation, we may not substitute our judgment for that of the jury." *Id.* (quoting *Jackson*, 364 S.W.3d at 325).

United pleaded the affirmative defense of proportionate responsibility and bore the burden of proving, by a preponderance of the evidence, that Memorial's responsibility for causing or contributing to cause the injuries for which it sought recovery of damages was greater than fifty percent. *See* CIV. PRAC. & REM. §§ 33.001–.003; *Arceneaux v. Pinnacle Ent., Inc.*, 523 S.W.3d 746, 747 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Memorial argues that "[a] finding that Memorial is anywhere near as much as 50% or more responsible for [its damages] or that zero damages occurred is not a rational finding based upon [the] record." United responds that, "[t]he jury was

entitled to find that [Memorial] was 97% responsible for any damages because [Bill] invited [Bob] to dump waste there." United also states that, "[t]he jury was entitled to find that [Memorial] did not suffer any damages because the [Memorial] [p]roperty was already contaminated with dirty fill."

As set out above, the jury found that: Memorial was ninety-seven percent responsible for its own injury, while Tim, BTT, and United were each one percent responsible; the amount to repair, fix, or restore the property to the condition preceding the trespass was $0; and the Memorial property did not decline in value due to the trespass. As to each of these findings, the evidence at trial was conflicting but supported the jury's findings. Bob testified that in a personal conversation with Bill he was told that Memorial accepted any fill "except trash, tree limbs, or tires," and Tim testified that Bob had been dumping there for twenty years. Dr. Tramm similarly concluded that people had been dumping material at the Memorial Property for at least twenty years and that the test pits that were dug all contained waste that did not come from Holley Chevrolet. Bill also wrote to Bob that he did "not have a problem with [the Memorial property] being used" to dump the Holley Chevrolet material but asked that the material "be pushed and covered."

Further, Dr. Tramm estimated that the Holley Chevrolet waste constituted less than one percent of the amount that Pirkle was asked to remove from the property. And contrary to Sloan's testimony that the Ruths could not further develop the property, Dr. Tramm testified that cinder block constituted most of the Holley Chevrolet waste, it is inert, and in lieu of removal, it can be run over and crushed by the bulldozer Mills had out there and rendered suitable fill to build on. In stark contrast to Pirkle's excavation estimate, Dr. Tramm opined that even if the material

dumped from Holley Chevrolet were to be removed, it would only cost $18,022.50 to do so.

In reviewing the jury's verdict and considering how it may have weighed, factored or discounted evidence, we must recognize that "[t]he jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Lesikar v. Rappeport*, 33 S.W.3d 282, 296 (Tex. App.—Texarkana 2000, pet. denied). We may not act as a thirteenth juror in weighing the evidence and assessing the credibility of the witnesses. *Id.* Observing the factfinder's role to evaluate the credibility of the witnesses and to reconcile any inconsistencies or conflicts in the evidence, *see Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003), we cannot conclude that the jury's proportionate responsibility finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Burnett*, 549 S.W.3d at 225; *Dow Chem.*, 46 S.W.3d at 242; *Cain*, 709 S.W.2d at 176.

### 2. *Damages*

"Whether to award damages and how much is uniquely within the factfinder's discretion." *Golden Eagle*, 116 S.W.3d at 772. Juries are allowed broad discretion to award damages within the range of evidence presented at trial. *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.). But "there is no requirement that the evidence show precisely how the jury arrived at the specific amount awarded." *Id.* When supported by the evidence, we will not speculate on how the jury arrived at its award. *Id.* at 723–24. "Nonetheless, a jury must have an evidentiary basis for its findings." *Id.* at 724.

A plaintiff seeking to recover remedial damages must prove that the damages sought are reasonable and necessary. *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012); *Mustang Pipeline Co. v. Driver Pipeline Co.,* 134 S.W.3d 195, 200 (Tex. 2004). Therefore, that burden of proof was upon Memorial. For Memorial to

establish that the damages prayed for were reasonable and necessary, it "must [have] show[n] more than simply 'the nature of the injuries, the character of and need for the services rendered, and the amounts charged therefor.'" *McGinty*, 372 S.W.3d at 627 (quoting *Dall. Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 383 (Tex. 1956)). "Instead, some other 'evidence showing that the charges are reasonable' was required." *Id.* (quoting *Dall. Ry. & Terminal Co.,* 294 S.W.2d at 383).

In addressing Memorial's challenge to the jury's zero-damages finding in its answer to Question No. 7, we must distinguish "uncertainty as to the fact of damages" from "uncertainty merely as to the amount of damages." *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC,* 573 S.W.3d 224, 235 (Tex. 2019) (IBM) (emphasis added) (quoting *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 207 (Tex. 1985)). Memorial's factual sufficiency challenge to the jury's zero-damages finding rests on an assertion that the evidence conclusively established that it suffered some damages—some amount more than zero—as a result of the dumping trespass. Because Memorial bore the burden of proof on that issue, it must demonstrate on appeal that the jury's finding is against the great weight and preponderance of the evidence. *See Dow Chem.*, 46 S.W.3d at 242.

Here, we do not know how the jury arrived at its answer to Question No. 7. It may reflect the jury's opinion that Memorial had not proved its damages by a preponderance of the evidence, and not having carried its burden, the jury could properly have awarded nothing. Further, as argued by trial counsel for United, there does not appear to be any analysis of the quantity of additional contamination from any volume of material added to the property from BTT's dumping. The linear rationalization that it would cost $2.4 million to remove the total volume of the material dumped by BTT is about quantity, not the quality of the dumped fill. It does not equate to the amount, if any, of *unclean* fill added to the already existing total volume accumulated over a twenty-year period. The comparison in terms of

quantity is not necessarily evidence of how the Holley Chevrolet fill qualitatively altered the property value or the costs to remediate. Interestingly, in closing argument and without objection, trial counsel for United seized upon Dr. Tramm's testimony that the dumped cinder block material does not cause any actual harm to the property and, because they are not solid waste and are acceptable fill material, the jury should award "zero" in answer to Queston No. 7.

Further, the jury was instructed in Question No. 7 not to include any damages caused by Memorial's failure to use reasonable and ordinary care to prevent or reduce damage to its property. Again, in closing argument, trial counsel for United seized upon this instruction. The evidence showed that unfettered dumping on the property had been ongoing for twenty years. The jury had before it Bill's July 2, 2014 letter to BTT stating that he had no problem with [the Memorial property] being used" to dump the Holley Chevrolet material but asking that the material "be pushed and covered." How the jury might have weighed such evidence and what the jury might have considered proportionate to Memorial's lack of care in reducing or preventing the damages it claimed is unknown. These are matters over which the jury has a wide degree of discretion, and we cannot second guess this jury's reasoning based on this record.

Because Memorial's percentage of responsibility was found to be greater than 50 percent, it was not entitled to recover any damages. *See* CIV. PRAC. & REM. § 33.001; *Gonzalez*, 717 S.W.3d at 528. Moreover, based on this conflicting evidence, we conclude that the jury's finding of zero damages for remediation and loss of value to the Memorial property is supported by factually sufficient evidence. *See Burnett*, 549 S.W.3d at 225. Memorial's diminished value theory was based on Sloan's opinion on the property's value, and the jury was entitled to reject it. *See Golden Eagle*, 116 S.W.3d at 774–75. Trial counsel for United pointed out that damages had not been proven, in that no market value evidence or reduced appraisal

15

value was presented by Appellant, and he therefore asserted that the jury's answer to Question No. 8 should be "zero." These perspectives may have been persuasive to the jury given the argued lack of evidence.

For all of these reasons, we overrule Memorial's second issue.

## IV. *This Court's Ruling*

We affirm the judgment of the trial court.


W. BRUCE WILLIAMS

JUSTICE


January 22, 2026

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

16